EDWARD M. KENNEDY vs. JUSTICE OF THE DISTRICT COURT
OF DUKES COUNTY
(and two companion cases[1]).

Suffolk.   October 8, 1969. — October 30, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Inquest. Supreme Judicial Court,* Supervision of inferior courts. *Certiorari. Judge.*

Statement of the statutory background of inquests held under G. L. c. 38, §§ 8–13.  [371–372]

Certiorari did not lie to review rulings by a District Court judge relating to procedure to be followed at an inquest to be conducted by him under G. L. c. 38, §§ 8–13.  [373]

Public interest in and extensive publicity respecting the death of a woman while a passenger in an automobile operated by a prominent political person when it went off a bridge on an island, and the operator's activities thereafter, and unusual problems presented by an inquest into the woman's death to be conducted pursuant to G. L. c. 38, §§ 8–13, by a District Court judge who had made rulings respecting procedure to be followed at the inquest, made it appropriate for this court to exercise its extensive administrative powers, including those under c. 211, § 3, as amended through St. 1956, c. 707, § 1, to review the rulings in order to avoid risk of serious abuse of the inquest procedure or of a miscarriage of justice.  [373, 375–376]

Discussion of the character and conduct of an inquest held under G. L. c. 38, §§ 8–13.  [373–375]

Inquest proceedings under G. L. c. 38, §§ 8–13, are not accusatory and should be regarded as investigatory.  [376]

Statement of the principles and the procedure to be applied in all inquests held under G. L. c. 38, §§ 8–13.  [377–378]

Nothing in the record of proceedings against a District Court judge to review his rulings as to the procedure to be followed at an inquest to be conducted by him indicated that he should be disqualified from conducting the inquest because he was a party to the review proceedings or to avoid bias or the appearance of bias.  [379]

THREE PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on September 2, 1969.

---

[1] The companion cases are petitions by Joseph Gargan and by John B. Crimmins and seven other petitioners against the same respondent.

The cases were reported by *Reardon, J.*

*Edward B. Hanify* (*Robert G. Clark, Jr., John M. Harrington, Jr., Thomas G. Dignan, Jr., Robert F. Hayes & John S. Hopkins, III,* with him) for Edward M. Kennedy.

*Paul J. Redmond* (*Daniel J. Daley* with him) for John B. Crimmins & others.

*Joseph P. Donahue, Jr.* (*George W. Anthes* with him) for Joseph Gargan.

*Joseph J. Hurley,* Assistant Attorney General (*Robert H. Quinn,* Attorney General, and *Walter H. Mayo, III, James P. Kiernan, Ruth I. Abrams & William E. Searson, III,* Assistant Attorneys General, with him) for the Justice of the District Court of Dukes County.

*Henry P. Monaghan,* for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

BY THE COURT. These cases, originally brought in the county court for Suffolk County, are each entitled, "Petition for Writ of Certiorari and Related Relief Pursuant to G. L. c. 211, § 3." They seek review of certain acts of the respondent relating to an inquest at which he was to preside. The cases involve questions not covered by our decisions. To expedite their consideration, the single justice properly reserved and reported the cases "for such decree as may be appropriate." The record consists of the consolidated petitions, the respondent's return, the transcript of proceedings in the county court, the single justice's order of September 2, 1969, which enjoined the respondent from proceeding with the inquest pending a determination by the full court, and the statement of agreed facts.

We summarize the agreed facts. On or about July 18, 1969, Miss Mary Jo Kopechne of the District of Columbia, formerly a secretary in Washington to the brother of the petitioner Kennedy, died after the automobile in which she was riding and which was operated by the petitioner Kennedy went off "Dyke Bridge" on Chappaquiddick Island in the County of Dukes County. Each of the petitioners and the deceased were in attendance at a social event which took place on Chappaquiddick Island on the evening of July 18.

On July 25 the petitioner Kennedy before the respondent, the justice of the District Court of Dukes County, pleaded guilty to, and was sentenced, upon a complaint under G. L. c. 90, § 24 (2) (a), commonly known as leaving the scene of an accident after causing personal injury.

Later that day the petitioner Kennedy requested and received from the three major Boston television stations and their associated radio stations, the opportunity to address the voters of the Commonwealth. The national television and radio networks requested and received from this petitioner and from those Boston television and radio stations, permission to tie in and broadcast his statement, which was later broadcast nationally by television and radio. The statement, which is set forth verbatim in the agreed facts, contains some explanation of his conduct. He in part stated: "These events and the publicity and innuendo and whispers which have surrounded them, and my admission of guilt this morning, raises the question in my mind of whether my standing among the people of my State has been so impaired that I should resign my seat in the United States Senate." He concluded by appealing to the people of Massachusetts for their advice and opinion to enable him to make a decision on that question.

On August 7 the district attorney of the Southern District by letter to the respondent exercised his authority under G. L. c. 38, § 8 (as amended through St. 1939, c. 30),[2] to require an inquest in the death of Miss Kopechne. On August 8 the respondent designated September 3 as the date for the inquest and announced in open court: "The statutes permit exclusion of all those not required to attend. I have decided to exercise some discretion in that regard and to exclude all except legitimate and accredited members of the press, television, radio and other news media." Subpoenas were served upon fifteen witnesses, and other subpoenas were issued by the clerk, but not served, on the petitioners in one of the two companion cases. Thereafter

[2] See footnote 3.

the clerk of the District Court drew up and posted a long list of representatives of news media who would be permitted to attend the inquest. The court room, the only one on the island of Martha's Vineyard, has 160 seats, 120 of which are outside the bar enclosure. Because the petitioner Kennedy is a prominent political figure, all events relating to the accident, including the scheduled inquest, have been given extensive coverage by the local, national, and international news media.

The petitioner Kennedy, describing himself as "the operator of the motor vehicle," and all the other petitioners, describing themselves as "prospective witnesses," filed motions in substance that they "be permitted the right to be represented by counsel . . . and to have counsel present during the entire proceeding, that . . . counsel be permitted to examine and cross-examine all witnesses and to seek rulings from the court with respect to the relevancy . . . of all evidence, to present evidence and to have the power to compel attendance of witnesses . . . ." There were hearings before the respondent on August 27 and 28. These motions were denied on August 28, the judge stating: "I am not satisfied that the United States Supreme Court would read the Due Process Clause into our inquest procedure. That is for the United States Supreme Court to say and not for me. . . . Witnesses will come into the courtroom singly, may be represented during their appearance in the courtroom by counsel for the sole purpose of advice on constitutional rights against self-incrimination and, where appropriate, [on] privileged communications, and for no other purpose and counsel for that witness will leave the courtroom when the witness leaves the courtroom."

During the hearings the respondent twice declared that it was essential that the petitioner Kennedy, the only eyewitness, be present at the inquest.

At the August 27 hearing, in response to a question by counsel for some petitioners as to "what the ground rules are going to be," the judge had said "That the scope of the proceedings will be such as will enable me to submit the report

required" by G. L. c. 38, § 12. "That is, that I must report in writing when, where and by what means the person met her death, her name, if known, and all material circumstances attending her death and the name, if known, of any person whose unlawful act or negligence appears to have contributed thereto. I will go no farther than saying that will be the scope of the inquest. As to physical aspects, I can tell you that there will be no microphones, no cameras, no listening or recording devices allowed in the courtroom. . . . The District Attorney has an option to examine and call witnesses, but as I see it, the primary responsibility rests with the judge who may, and in my case would, call any other witnesses, as the evidence develops, he thinks might have something to add to the truth." On the following day at the hearing the judge repeated that he would call "everybody who can be helpful in reaching the required decision."

The petitions for writs of certiorari allege that the rulings of the respondent deprive the petitioners of rights secured to them by the Sixth Amendment to the Constitution of the United States as applied to the States by the Fourteenth Amendment in that (1) the order of August 28 operates to deprive them of the rights to be represented by counsel, to confront and cross-examine witnesses, to present evidence and to compel the attendance of witnesses, in "a public and formal judicial proceeding which constitutes the exercise of an accusatory function"; and (2) the ruling of August 8 "sanctions publicity in connection with a hearing of a preliminary nature so widespread as to taint with irremediable prejudice any subsequent judicial proceedings which may arise out of the accident." The petitions allege that the rulings have caused substantial injury and manifest injustice to the petitioners.

In this Commonwealth over a century ago inquests in violent deaths were conducted by coroners with a jury of six. Rev. Sts. (1836) c. 140, §§ 1, 2. The coroner had power to summon and swear witnesses (§§ 5, 6), whose testimony was reduced to writing by the coroner (§ 7). The jury

delivered to the coroner their inquisition in which they were to find when, how, and by what means the deceased person came to his death and all the material circumstances. If it appeared that he was murdered, the jurors were to state who was guilty (§ 8). The coroner had power to bind over witnesses to the appropriate court (§ 9). If any person charged by the inquest with having committed the offence was not in custody, the coroner had power to issue process for his apprehension (§ 10).

By St. 1850, c. 133, § 1, it was provided that the coroner with the consent of a majority of the jury "may order that a secret inquisition be taken." In such case he might at his discretion exclude all persons other than those required to be present, and during the examination of a witness might exclude all the other witnesses, and direct that they be kept separate. By St. 1877, c. 200, the office of coroner was abolished (§ 1), and that of medical examiner was created (§ 2). The inquest was to be conducted by the court or a trial justice (§ 10), who was to make the report (§ 12). He had power in certain cases to bind over witnesses "as in criminal prosecutions" to appear and testify at the court in which an indictment might be found (§ 13), and to issue process for arrest of persons not in custody (§ 14).

The subject of inquests is now covered by G. L. c. 38, §§ 8–13.[3]

---

[3] ". . . The . . . district attorney may . . . require an inquest to be held in case of any death supposed to have been caused by external means. The court or justice shall give seasonable notice of the time and place of the inquest . . . to the department of public works in any case of death in which any motor vehicle is involved. All persons not required by law to attend may be excluded from the inquest. The district attorney . . . may attend the inquest and examine the witnesses, who may be kept separate so that they cannot converse with each other until they have been examined" (§ 8). "The magistrate shall report in writing when, where and by what means the person met his death, . . . and the name, if known, of any person whose unlawful act or negligence appears to have contributed thereto. He shall file his report in the superior court for the county where the inquest is held" (§ 12). "If a person charged by the report with the commission of a crime is at large, the magistrate shall forthwith issue process for his arrest, returnable before any court or magistrate having jurisdiction. If he finds that murder, manslaughter or an assault has been committed, he may bind over, for appearance in said court, as in criminal cases, such witnesses as he considers necessary, or as the district attorney may designate" (§ 13).

At the threshold lies a serious question of procedure. It is our opinion that certiorari will not lie. We have been referred to *Drowne* v. *Stimpson,* 2 Mass. 441, 445, where proceedings on a bastardy complaint were quashed on writ of error. The last sentence of that opinion drew a distinction from certiorari which, it was there said, would lie at "any stage of the proceedings, at the *discretion* of the court." This statement was not necessary to that decision, and has not been adopted in our practice as a method of reviewing rulings by a quasi-judicial tribunal before any final determination by that tribunal.[4] We need not now intimate whether there may be a review of an inquest like the present after completion of the proceeding.

We are asked by the petitioners to exercise our extensive powers including those under G. L. c. 211, § 3 (as amended through St. 1956, c. 707, § 1). This statute recognizes that this court has "general superintendence of the administration of all courts of inferior jurisdiction" including the issuance of "such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration." We have seldom exercised these powers except as one basis for a rule of general application. Nevertheless, we consider whether there is such risk of serious abuse of the inquest procedure, or of a miscarriage of justice, as to make it appropriate for us to act.

The practice in inquests in the Commonwealth has been to allow the course of the proceedings to remain in the discretion of the District Court. An inquest is not a prosecution of anybody. It is not a trial of anyone. The pertinent statutory provisions exemplify a public policy that the inquest serves as an aid in the achievement of justice by obtaining information as to whether a crime has been committed. See Second and Final Report of Judicature Com-

---

[4] Holding an inquest is a quasi-judicial function. *LaChapelle* v. *United Shoe Mach. Corp.* 318 Mass. 166, 169, and cases cited.

mission, 6 Mass. L. Q. No. 2, p. 109. Probably most inquests have been closed to the public. Some inquests have been public, usually where the matter was not of general interest.

It never has been expressly provided in legislation in this Commonwealth that inquests must be secret. We cannot attribute that result to the ambiguous statement in *Jewett* v. *Boston Elev. Ry.* 219 Mass. 528, 532, where the authorities cited are statutes which are the ancestors of sections now in G. L. c. 38, relating to medical examiners and inquests, and show that no such interpretation was intended. When the Legislature has intended to have closed proceedings, as in the case of the grand jury, the statutory language has been unmistakable. See G. L. c. 277, §§ 12, 13.

Few decisions in the Commonwealth discuss the conduct of inquests. Such decisions as there are seem to be consistent with what appears to be the law generally. This is, in effect, that inquests are investigatory in character and not accusatory. *State ex rel. Schulter* v. *Roraff*, 39 Wis. 2d 342, 350–351. *Wolfe* v. *Robinson* (1961) Ont. 250, 262, 27 D. L. R. 2d 98; affd. (1962) Ont. 132, 31 D. L. R. 2d 233. They are not part of any criminal proceedings which may ensue. *People* v. *Coker*, 104 Cal. App. 2d 224, 225. *State* v. *Burnett*, 357 Mo. 106, 112. Cf. *LaChapelle* v. *United Shoe Mach. Corp.* 318 Mass. 166, 169–170. Under statutes resembling our own, in order to initiate a criminal prosecution, there must be subsequent and independent criminal proceedings. *Smalls* v. *State*, 101 Ga. 570, 571. *Commonwealth ex rel. Czako* v. *Maroney*, 412 Pa. 448, 450. It may be that, to show an admission or confession at an inquest or to prove the prior inconsistent statement of a witness, some evidence at an inquest will be admissible at later criminal proceedings in accordance with usual principles of the law of evidence. The inquest decision itself is not admissible. See *Jewett* v. *Boston Elev. Ry.* 219 Mass. 528, 531–533; *Aetna Life Ins. Co.* v. *Milward*, 118 Ky. 716, 725–731. See also *Commonwealth* v. *Ryan*, 134 Mass. 223. There is no inherent right of any witness at an inquest to cross-examine

other witnesses or to present evidence of his own. *Aetna Life Ins. Co.* v. *Milward*, 118 Ky. 716, 726. *State* v. *Griffin*, 98 S. C. 105, 111. *People* v. *Collins*, 20 How. Pract. Rep. 111, 114 (N. Y. Oyer and Terminer). The magistrate holding the inquest has wide discretion on its conduct. Anderson, Sheriffs, Coroners & Constables, § 747. He may permit cross-examination or the presentation of evidence by possibly interested persons when it may be helpful to the magistrate or might serve to diminish the possibility of injustice or to avoid injury to reputation. There is, of course, some practical limit to the number of counsel who helpfully can participate in the same hearing at the same time. He may, we assume, receive and record sworn offers of proof as an aid to determining whether the receipt of testimony will help him in any respect or as a method of affording witnesses the opportunity for amplification or correction of their own testimony or that of others. He should carefully explain to witnesses, if it appears to be necessary or appropriate to do so, their privilege not to incriminate themselves. See *State* v. *Burnett*, 357 Mo. 106, 112–114. See also *People* v. *Ferola*, 215 N. Y. 285. Cf. *Neely* v. *United States*, 144 F. 2d 519 (Ct. App. D. C.), cert. den. 323 U. S. 754. The inquest judge also may close the hearings in whole or in part and at any time in order to avoid unfairness to anyone or to prevent improper prejudice in possible subsequent criminal proceedings. G. L. c. 38, § 8. In so doing he may take into account previous public statements and the relative advantages and risks of public, compared with closed, hearings, including the risk of erroneous rumors.

The inquest here presents unusual problems. It has aroused great public interest, which in turn has stimulated very great efforts by the press, radio, television, and other media to provide news coverage. The petitioners suggest that intensive coverage of the inquest might involve unfortunate pre-trial publicity if the proceedings and the report should lead to action before a grand jury or to a prosecution for some offence. The circumstance that the petitioner

Kennedy was the operator of the vehicle and the only available eyewitness has caused him to become what his counsel describes as the focus of the investigation. This has led to the argument that the proceedings have become accusatory as to him and to a demand that he at once be accorded what would be constitutional rights of a defendant in a criminal case. The other petitioners make somewhat similar claims for themselves.

We think that inquest proceedings are not accusatory and that they should be regarded as investigatory. The decisions already cited are controlling in this respect. Nevertheless, if the proceedings are public, the activities of the news media may be such as to make it difficult, if not impossible, for a long time to ensure to a defendant a fair trial in any criminal proceedings which may follow the inquest. A public inquest also may tend to limit or delay the inquest investigation.

The difficulties presented are not lessened by the circumstance that the petitioner Kennedy's own resort to television may itself have increased public interest in the events of July 18, 1969, and public demand for a more complete investigation and explanation of those events. The risk of prejudice in possible later proceedings from pre-trial publicity remains.

We shall not make any special rule for a particular case. If it is desirable to prescribe procedural rules for any Massachusetts inquest, those rules must affect all inquests and all participating persons equally. Although few inquests may be likely to arouse public interest as has this one, other situations involving similar risks of prejudice may occur and citizens and others, less well known to the public and less able to protect themselves, affected by, or participating in less conspicuous inquests, must have whatever type of protection, if any, is now to be afforded to these petitioners.

Recent cases in the Supreme Court of the United States discussing the dangers of pre-trial publicity go far in the direction of protecting actual defendants. See e.g. *Estes* v. *Texas*, 381 U. S. 532; *Sheppard* v. *Maxwell*, 384 U. S. 333.

See also *Delaney* v. *United States*, 199 F. 2d 107, 115 (1st Cir.). See *State ex rel. Schulter* v. *Roraff*, 39 Wis. 2d 342. They point to the wisdom of taking action to diminish such dangers.

The petitioners also lay great store by *Jenkins* v. *McKeithen*, 395 U. S. 411, a 5 to 3 decision of the Supreme Court of the United States dated June 9, 1969, in a controversy between a labor union member and the Labor-Management Commission of Inquiry created by an unusual Louisiana statute. The opinion of three justices appears to rest in large measure upon the ground (pp. 424-425) that the complaint contained sufficient allegations of injury to the complainant to afford him "standing to challenge" the statute and (pp. 429-431) to make a hearing in the trial court appropriate to determine whether the complainant was "entitled to declaratory or injunctive relief." Two justices concurred. There was a persuasive dissent in which three justices joined. One justice of the three joining in the first opinion has retired. We are by no means clear what the precise ratio decidendi is, or that the decision (see e.g. p. 430) has any necessary application to our investigatory inquest procedure, which has a long historical background. We hope that the *Jenkins* case will be materially clarified before we are again confronted by it.

The cases just cited, although in our opinion not decisive, do suggest general reappraisal of our inquest procedure in the interest of making it conform more closely with certain constitutional views expressed in the decisions, mentioned above, of the Supreme Court of the United States. We think that, to protect the integrity, the investigatory character, and the effectiveness of inquests, it is desirable to prescribe application of the following general principles: (1) All inquests shall be closed to the public and to all news media. (2) Witnesses may be accompanied and advised by counsel while in attendance or testifying at an inquest. (3) In other respects, inquests shall be conducted in the sound discretion of the inquest judge in general in accordance with the principles already discussed above. (4) Upon the completion of the inquest, the inquest documents shall

remain impounded and the inquest judge shall transmit his report and a transcript of the evidence received by him to the appropriate clerk of the Superior Court. (5) While these papers remain impounded, access to the report and transcript shall be afforded only to the Attorney General, the appropriate District Attorney, and to counsel for any person who has been stated in the report as having actual or possible responsibility for the decedent's death, except that any witness at the inquest shall be permitted, through counsel or directly, to check the accuracy of the transcript of his own testimony and to file with the inquest judge and the appropriate clerk of the Superior Court any suggested corrections. (6) (a) If the District Attorney shall file with the appropriate clerk of the Superior Court a written certificate that no prosecution is proposed, or (b) if it shall appear that an indictment has been sought and not returned, or (c) if trial of the persons named in the report as responsible for the decedent's death shall have been completed, or (d) if a judge of the Superior Court shall determine that no criminal trial is likely, then upon order of the Superior Court, the report and transcript shall be opened forthwith to public examination.

The principles outlined above should not hinder or delay the pending inquest or any other proper inquest inquiry. Indeed, such inquiries may be substantially facilitated by encouraging witnesses to come forward and to make full disclosure without fear that their testimony will be published in segments or out of context, or published at all (a) until passed upon by the inquest judge in his report and until the events have been considered by the fact finder in any criminal proceeding, and (b) until after probability of criminal proceedings has ceased. These general rules tend to avoid embarrassment, by premature publicity about an investigation conducted in behalf of the Commonwealth, either to the Commonwealth (in seeking or prosecuting indictments or complaints) or to any potential defendant in making a defence. Under the principles stated, all facts concerning the inquiry must eventually be published, and

at the earliest possible time consistent with fairness to all parties. Their application, as has been suggested above, will make the Massachusetts inquest procedure less vulnerable to future constitutional objection if some views expressed in the *Jenkins* case, 395 U. S. 411, *supra*, should be expanded.

The District Court judge should not be disqualified on the record before us. The first reason given is that the judge is a party to the present litigation. He was, of course, made a formal party by the petitioners as a method of seeking review of the orders. This is not enough to disqualify him. *Kelly* v. *New York, N. H. & H. R.R.* 139 F. Supp. 319, 320 (D. Mass.). The petitioners also argue that disqualification will avoid bias or the appearance of bias. An earlier expression of opinion on a matter to be decided is not the kind of bias which disqualifies a judge. *King* v. *Grace*, 293 Mass. 244, 247, and cases cited. The alleged bias and prejudice to be disqualifying must rise from an extrajudicial source and not from something learned from participation in the case. *United States* v. *Grinnell Corp.* 384 U. S. 563, 583.

The petitions for writs of certiorari are to be dismissed. The proposed inquest, and all inquests hereafter, shall proceed in compliance with the general principles herein specified.

*So ordered.*