**Sidney R. LIPMAN et al.,
Plaintiffs-Appellants,**

v.

**COMMONWEALTH OF MASSACHU-
SETTS et al., Defendants-
Appellees.**

**No. 72–1315.**

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1972.

Decided Feb. 2, 1973.

On Motion for Rehearing Feb. 14, 1973.

---

Jerome P. Facher, Boston, Mass., with whom Harry T. Daniels and Hale & Dorr, Boston, Mass., were on brief, for appellants.

Walter H. Mayo III, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., was on brief, for appellee, Commonwealth of Massachusetts.

Kevin M. Keating, Boston, Mass., with whom Charlotte Anne ·Perretta and Crane, Inker & Oteri, Boston, Mass., were on brief, for appellee, Edward V. Keating.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

ALDRICH, Senior Judge.

On the night of July 18, 1969, Mary Jo Kopechne was accidentally drowned at Chappaquiddick Island, Massachusetts, under circumstances which attracted national, and, indeed, international attention. Because of the possibility of criminal activity in connection therewith a district court inquest was ordered. Massachusetts district courts having no official or regular reporters, plaintiff Lipman,[1] an experienced freelance court stenographer, was engaged by the County District Attorney, one Dinis, to record and transcribe the testimony. Recognizing the marketable value to wire services, newspapers and magazines, of copies of the transcript, plaintiff prepared to make daily copy in substantial quantity, and incurred various expenses in connection therewith. There is no suggestion that this was

---

1. There is a second plaintiff, but for purposes of convenience he may be disregarded.

other than for his personal benefit, or that the expenditure presently affords him any claim. At the same time it seems apparent, in view of the physical preparations in the courthouse, that the district judge knew and had no objection to the procedure. In the light of certain additional evidence, we will assume, for the purposes of this case, that the judge affirmatively assented. Senator Edward M. Kennedy, however, who had been driving the car in which Kopechne met her death, became apprehensive that the publicity attending the inquest would be detrimental to him in connection with subsequent criminal proceedings, if such should eventuate. He instituted proceedings in the Massachusetts Supreme Judicial Court. The court agreed with him, and ordered the inquest held in camera and the transcript impounded until certain conditions were met. Kennedy v. Justice of the District Court of Dukes County, 1969, 356 Mass. 367, 252 N.E.2d 201.[2] The inquest was rescheduled and plaintiff was rehired, this time by the district judge, who designated plaintiff the official reporter. The judge requested two copies of the transcript on a daily basis, and each day plaintiff turned these over, together with his notes, keeping nothing himself. Nothing was said about further copies. The impounding order meant, of course, that daily copy could not be sold to the media. When the inquest was completed, the Chief Justice of the Superior Court, pursuant to the *Kennedy* opinion, ordered the transcript impounded and transferred to the office of the Superior Court Clerk for Suffolk County.

Thereafter it came to plaintiff's attention that defendant Keating, Clerk of the Massachusetts Superior Court, was planning to have the Xerox Corporation make a large number of copies of the transcript. Keating, in his capacity as clerk, would then sell the copies to the public when the impounding order was lifted. Keating proposed to require a deposit of $75. per copy, a portion to be refunded if unnecessary to defray copying costs. Plaintiff's charge for the 794 page transcript would have been much higher: approximately $560. per copy at customary freelance rates, or $320. per copy at rates charged by official Superior Court reporters.[3]

Since plaintiff had many contracts to sell copies, there followed a flurry of activity to prevent what he feared might be an irretrievable loss, because of judicial immunity and other impediments, if sales should be made at $75. by the Clerk. He applied to the Superior Court and the Supreme Judicial Court of Massachusetts, asking permission to sell the transcript. He also applied to the United States District Court, and ultimately to this court, for an injunction against what he termed defendant Keating's unconstitutional taking of his property without due process. When the dust, we might almost say smoke, had cleared, plaintiff found himself with a state court order authorizing Keating to carry out his announced intention of selling to all comers at a deposit of $75, but to retain in escrow any balance of receipts over expenses pending the outcome of this litigation, and with no counter-order from the federal court.[4] On the release day the Superior Court sold, simultaneously, 111 copies of the transcript, and thereafter placed in the escrow account the sum of $3,225, as profit over

---

2. The court did not limit its ruling to the Kopechne inquest, but laid down general rules for all inquests thereafter to be held in the Commonwealth.

3. The daily rate was even higher. At this rate, which is what the *media* had contracted for before the impounding order, a single copy might have cost over $800. Certainly this figure could not have been thought involved after the inquest was closed to the public.

4. We declined to consider the merits at that time since we believed that the interest of the state court in controlling its transcript was more important than plaintiff's rights, assuming he could establish any. Noting the possibility that immunity might unfairly affect plaintiff's claim, we made certain suggestions, one of which was an escrow account.

expenses.[5] The notes were subsequently returned to plaintiff. They were of no use to him—he has sold nothing further.[6]

■ The district court, in addition to denying plaintiff's claim for a preliminary injunction of the sale, had treated defendants' motion to dismiss as one for summary judgment and had granted it. Lipman v. Commonwealth, D.Mass., 1970, 311 F.Supp. 593. In an order issued after the sale had taken place we vacated this judgment and ordered a full trial. The district court, 345 F.Supp. 523, following that trial, dismissed as against Keating on the ground that he was protected as an officer of the court entitled to judicial immunity. It also dismissed as against the Commonwealth, rejecting plaintiff's claim on the merits and also finding the Commonwealth protected by sovereign immunity. Since it is unnecessary to reach the formidable immunity defenses raised by defendants if we find plaintiff not entitled to relief on the merits we turn to the question of what rights plaintiff had in the reproduction and sale of the transcript.[7]

■ Plaintiff claims both a property right and a common law copyright in the transcript. With respect to the lat-ter he cites an English case, Walter v. Lane, [1900] A.C. 539, but no other authority. Without deprecating the mechanical skill necessary to become a stenotypist, we can recognize no ownership for that reason in a transcription of a judicial hearing. Since transcription is by definition a verbatim recording of other persons' statements, there can be no originality in the reporter's product. See Nimmer on Copyright, §§ 10, 66.[8]

■ We move to plaintiff's more substantial claim of a property right, which might also be thought of as a contract right. See note 7, ante. Having no express agreement,[9] plaintiff points to a custom, which he says is universal, to permit a court reporter to sell transcript copies to all who desire them. The district court rejected this claim in its first proceeding, but we vacated those findings, believing the court had taken too narrow a view of the relevant custom. We ordered the court on remand to consider "custom and usage in the reporters' trade generally." We did this in part because of a substantial showing made by plaintiff, starting with the fact that official Massachusetts court reporters are by statute permitted to charge

5. The court below assumed, as we do, that this retained "profit" will be refunded pro rata to the transcript purchasers. We might well have approached the matter of the escrow fund in a different manner had we been led to believe that the Commonwealth was being enriched at the expense of plaintiff. See post.

6. Once the content was out, no more copies were sought. It is apparent that the large number of initial buyers was due to a widespread fear among the media of being scooped.

7. In the numerous times this case has been before us, no serious question of subject matter jurisdiction has been raised. We note first that plaintiff asserts a claim in excess of $10,000. See 28 U.S.C. § 1331 (a). The bases of his claim are a property right in his notes that were withheld from him until they were no longer useful, a common law copyright, and a custom which permits court reporters to sell transcript copies. The first two are clearly traditional property interests and the third, while in some respects analogous to a contract right, can certainly be thought of as a "legitimate claim of entitlement." Board of Regents v. Roth, 1972, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. Thus the complaint states property rights protected by 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) against state deprivation. See Lynch v. Household Finance Corp., 1972, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424. Cf. Goldberg v. Kelly, 1970, 397 U.S. 254, 261, 263, n. 8, 90 S.Ct. 1011, 25 L.Ed. 2d 287.

8. Defendant Keating points out that the English court in the Lane case was dealing with a copyright statute that did not require "originality either in thought or in language." [1900] A.C. at 548.

9. Plaintiff does suggest that the district attorney made such an agreement, but if only for reasons we are about to come to, we recognize in Dinis no authority to do so.

for copies to the parties even though they receive a basic salary. Mass.G.L. c. 221, § 88.[10] Freelance reporters, having no salary, would seem, prima facie, even more in need of the additional remuneration. The evidence developed on remand showed, without contradition, that in respect to other judicial proceedings freelance reporters regularly had this opportunity. The district court nevertheless held this irrelevant because plaintiff could show no custom with respect to "[sale] to non-parties [of] plural copies of an official inquest." While the court was free to reject any implication in our remand which ordered it to consider custom and usage in the reporters' trade generally, it suggested no reason for distinguishing inquests from other judicial proceedings, but assumed it without discussion.

In the absence of any affirmative reason, we are unable to think that a custom permitting reporters to sell transcripts of judicial proceedings generally ceases in some particular instance merely because the purpose of the proceeding varies. The Commonwealth asserts that a reason is to be found in the standards announced in the *Kennedy* opinion. Since the court said nothing on the subject of reproduction and sale of copies, whatever changes it made in that connection should be those which naturally followed from its rulings. The significant rulings were that the inquest was to be secret and the transcript impounded until it was apparent that no prosecution would ensue. While manifestly this prevented sale of copies before then, we find no implication of any new principle as to sale once the public release date occurred.

■ No doubt counsel felt obliged to make the argument he did, but we consider it groundless. Indeed, each time that we pressed him, counsel retreated to the broad position that the district courts have, generally, no official reporters. Why this circumstance should permit freelance reporters to sell transcripts when hired in superior court proceedings, but not when they are officially hired, on occasion, in the district court, counsel did not say, nor could we. Clearly there was a general custom of some sort with respect to sale of copies of judicial transcripts. We see no basis for a finding that, other than as to the release date, inquest proceedings were an exception.

■ Plaintiff's difficulties, however, are not over; it is necessary to pinpoint the custom. One of plaintiff's witnesses, an official Massachusetts reporter of many years experience, testified that before sale of copies of a trial transcript to non-parties she sought the court's permission. No substantial persuasive evidence contradicted that testimony. Apart from the technical possibility that plaintiff may be bound by his own witness in such circumstances, we find this testimony both significant and appealing. We ourselves, although we would want our reporters adequately paid, would not have been happy with the prospect of compelling a large number of anxious, to the point of captive, buyers, to pay $35,000 or more for what cost but $5,000 to reproduce. We would fully accept the proposition that freelance reporters count on the sales of copies of transcripts for their normal living wage, but this fact is hardly sufficient to explain to the public such a bonanza at its expense. A custom which, through the necessity of obtaining its consent, would permit the court to regulate the conditions of public sales seems quite understandable. We instinctively rebel at the notion that a court should be entirely without control over the reporter's use of an official transcript.[11]

10.  *Cf.* 28 U.S.C. § 753.

11.  It may be contended that no one has raised the matter of public relations until this moment. While no extensive discussion of the point occurred, the Superior Court's Memorandum of April 27, 1970 did allude to the plaintiff's intention of selling copies at $800. per copy and went on to state that sale by the Superior Court "seemed to be the fairest and most

Plaintiff points to the conceded fact that the court had never before engaged in reproducing and selling transcript copies. Granting this, it is apparent, also, that this is the only case where so many members of the public wanted copies, and found themselves, by reason of competitive pressure, in the position of having to pay almost whatever was asked. The fact that reporters hitherto sold transcripts to non-parties is not determinative. This was not an ordinary case. A general policy of non-intervention cannot mean that a court is stripped of its authority to act when it sees a need to do so.[12]

Having identified the custom, we consider whether plaintiff states a claim under it. We have found, ante, that prior to the injunction of the first inquest plaintiff had obtained at least implicit consent from the presiding judge to furnish daily copy to the press. When the inquest was aborted, however, and the proceedings ordered secreted, plaintiff dismantled his extensive daily-copying operation. While he states he was "re-engaged" by the presiding judge for the inquest, he concedes that he did not discuss with the judge the matter of post-impounding transcript sales, and since, after the *Kennedy* order, there were no external manifestations of reproduction at the courthouse, there is nothing to support a claim of implicit consent. Nor, of course, did he obtain consent from the Superior Court, which was responsible for release of the transcript, or from any other court.[13]

Although plaintiff has not made the separate point, what we have been saying applies only to sales to third persons; the question of sales to the parties remains. By statute, Mass.G.L. c. 221 § 88, official Superior Court reporters are entitled to sell copies to the parties at an established rate. Though plaintiff is a freelance reporter, we have noted previously that this difference should not affect his rights. Moreover, after the *Kennedy* opinion, plaintiff, for the first time, was hired as the "official" reporter. *See* Mass.G.L. c. 221 § 83. The evidence on custom and usage does not support a holding that reporters must seek court permission before selling transcripts to the parties, and the rationale behind the consent requirement does not apply to such sales. When sales are limited to those formally associated with the litigation, at an established rate, the potential of abuse by the reporter—at the expense of the public and to the embarrassment of the court—is eliminated.

We can think of no reason why, when a reduced rate is established for the benefit of the public, it should accrue to relieve the parties of the customary charge, or, when it was made ex post facto, deprive plaintiff of the benefits rightly expected at the time of his hiring. It is, of course, true that the parties might not have ordered as many copies had they been required to pay the going per-copy rate. It is late, however, to engage in such speculation. The fact is, they did order them. The further fact is that the money is available. It would seem prima facie unfair to no one to deduct from the escrow account, as a cost of the Superior Court operation

---

efficient way of making public the inquest documents, bearing in mind the great public interest and the volume of requests for copies from the press and radio and television stations all over the country." Moreover, it is our duty to consider all possible grounds upon which the court might have acted. This one readily occurs to us; indeed, it did so from the beginning.

12. Plaintiff seems to represent that defendant Keating was acting totally without court direction in devising, in early April,

the plan for distribution of the transcript. This would not only be irrelevant; for reasons not worth detailing it is contrary to our reading of the record.

13. Indeed, we interpret plaintiff's petition to the Supreme Judicial Court as an administrative appeal from the Superior Court's denial of consent. Plaintiff is correct in stating that the Supreme Judicial Court did not adjudicate his rights; it was, however, the last chance for plaintiff to perfect his rights, if formal consent was necessary.

whereby plaintiff was deprived of his legitimate expectations, the going official reporter rate for the parties' copies, and to order judgment in favor of the plaintiff in that amount.[14] As to this amount, chargeable against the fund, we see no immunity problems. *Cf.* Alcoa Steamship Co. v. Perez, 1 Cir., 1970, 424 F.2d 433. In the case at bar there was not, as in *Perez*, bad faith, but the contrary. However, placing the fund in a special count in the name of the clerk, *see* n.4, ante, avoids the need of a judgment against the Commonwealth treasury. We accordingly direct that judgment against defendant Keating, in his official capacity as Superior Court Clerk, be entered by the district court in the amount determined.

The judgment of the district court is vacated and the case remanded for further proceedings consistent herewith.

## MEMORANDUM ON MOTION FOR REHEARING

### PER CURIAM.

Plaintiffs, by motion for rehearing, assert that the matter of a custom requiring the court's permission for the sale of transcripts to non-parties was not adequately developed at argument, and that they wish to pursue it further. We question the premise. Assuming, however, it to be true, the petition is nonetheless denied. We would consider that a court has inherent power to prevent the sale of transcripts at an exorbitant profit—public confidence in administration of the courts demands no less. The fact—if it be the fact—that the Dukes County District Court originally consented to an exorbitant profit does not prevent the Supreme Judicial Court from taking a second look.

14. It is true that the potential refundees are hereby having their repayments reduced without an opportunity to be individually heard. However, the amount is small ("deminimis and only a trifel," to quote from a current brief in another case), especially so in the light of what they would have had to pay if plaintiff had been allowed to sell copies at the full rate. It is also to be borne in mind that without this deduction plaintiff will not receive even a modest copy profit.