**1278**

Rudy DAVIS, Harry McDaniels, Elmer Groom, Quentin Waples, Clem Wise, Milton Bowman, Robert Meyers, Trustees of the Methodist Church, a corporation of Rock, Kansas; et al., Plaintiffs-Appellants,

v.

CITIES SERVICE OIL COMPANY, Skelly Oil Company, American Petrofina, Incorporated, American Petrofina Company of Texas, Defendants-Appellees.

No. 66–68.

United States Court of Appeals Tenth Circuit.

Jan. 19, 1970.

Fred R. Vieux, Augusta, Kan., for appellants.

J. B. McKay, El Dorado, Kan., R. O. Mason, Bartlesville, Okl. (Cecil C. Cammack, Robert D. Oswalt, A. O. Holl, Roy Z. Johnson, Bartlesville, Okl., McKay & McKay, El Dorado, Kan., Holliman, Mason & Maddux, Bartlesville, Okl., of counsel, on the brief), for Cities Service Oil Co.

Cecil H. Frey, Tulsa, Okl. (Hawley C. Kerr, Tulsa, Okl., J. B. McKay and James B. McKay, Jr., El Dorado, Kan., on the brief), for Skelly Oil Co.

W. A. Kahrs, Wichita, Kan. (Robert H. Nelson, Wichita, Kan., on the brief),

for American Petrofina, Inc., and American Petrofina Co. of Texas.

Before MURRAH, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Plaintiffs-appellants, the owners or tenants of property on or near the Walnut River south of El Dorado, Kansas, claim that their lands were polluted by oil and other substances which, during floods in May and July, 1961, entered the river or its tributaries from the premises of the oil companies, defendants-appellees. Jurisdiction is based on diversity. Trial to the court required 43 days. The court made comprehensive findings and concluded that the plaintiffs had failed to establish the liability of the defendants. Judgment was entered in favor of the defendants, and this appeal followed.

We are concerned with an area in southeastern Kansas which is drained by the Walnut River and its tributaries. The river flows in a southerly direction. On the northern outskirts of the city of El Dorado, the Walnut is joined by a stream known as the West Branch of the Walnut River. Just south of the city, Constant Creek joins the Walnut from the west. The properties of the plaintiffs are located five or more miles southerly from El Dorado.

Petrofina operates a refinery north of El Dorado and on the westerly side of the West Branch. Skelly has a refinery just south of El Dorado and west of the Walnut. Tracks of the Santa Fe railroad run through both refineries between the main facilities and the stream. Just before flowing into the Walnut, Constant Creek crosses the northeast corner of the Skelly property. Cities Service has a number of producing oil wells in an area known as Oil Hill and located northwest of El Dorado. Cities Service also produces oil from the Risley and Moyle leases some distance south of El Dorado.

According to official records, the Walnut River at El Dorado was slightly under flood stage during the May rains and slightly over flood stage during the July rains. On both occasions, water left the banks of the Walnut and inundated portions of the adjacent farms. The flood waters contained oil which caused crop damage. As found by the trial court, "[t]he presence of oil in the Walnut River and on at least some, if not all, of the plaintiffs' properties downstream is not disputed."

■ The basic issue, as set forth in the pre-trial order signed by all the parties and approved by the court, is whether "pollution escape[d] from the premises of the defendants, or any of them, during the floods occurring in May and July, 1961."

No effort was made to amend or change this order. It measures the dimensions of the lawsuit. Century Refining Company v. Hall, 10 Cir., 316 F. 2d 15, 20.

■ The plaintiffs present as their prime argument an attack on the findings of the trial court. In effect they ask that we review the lengthy, complex, and poorly organized record and hold that as a matter of law they are entitled to damages and injunctive relief. They misconceive the function of an appellate court. It does not try the facts or substitute for the trial court in the determination of factual issues. Howard v. United States District Court for the District of Colorado, 10 Cir., 318 F. 2d 521, 523, and Maher v. Cities Service Pipe Line Company, 10 Cir., 286 F.2d 313, 315. The clearly erroneous rule governs the sufficiency of the evidence to support the findings. Southwestern Investment Co. v. Cactus Motor Co., 10 Cir., 355 F.2d 674, 676. In reviewing the evidence we recognize that the trial court, not the appellate court, determines the credibility of witnesses, McKeel v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 10 Cir., 419 F.2d 1291, and

that the appellate court will not disturb reasonable inferences drawn by the trial court. National Farmers Union Service Corporation v. United States, 10 Cir., 400 F.2d 483, 485. We reject the request of plaintiffs' counsel to weigh the evidence. Our problem is whether the findings are clearly erroneous.

■ We first consider the evidence pertinent to Skelly. Witnesses for the plaintiffs testified to the presence of oil along the east-west township road which borders Skelly on the south. None of them made any attempt to ascertain if the refinery was the source of the oil or if any oil had drained to the river from the area. Skelly employees testified that no oil escaped from that area of the refinery. We agree with the trial court that the plaintiffs, at the most, established the presence of oil in the vicinity of the road but neither the source nor the destination of the oil.

On the eastern side of the refinery, near the confluence of the Walnut and Constant Creek, is an impounding basin which holds excess water when the runoff from the refinery exceeds the capacity of an oil-water separator. The basin is east of the railroad tracks and below the Santa Fe seep, which will be mentioned later. Overflow from the basin is directly to the Walnut without processing except that effected by retention. An oil detention baffle in front of the outfall weir is designed to prevent oil escaping with water. Plaintiffs' photographic evidence showed oil stains on the inside of the weir. The evidence for Skelly was that no oil escaped from the basin during the floods and that oil stains on the land between the basin and the river resulted from high water coming from the upper reaches of the Walnut and Constant Creek. The trial court's finding that no oil escaped from the basin during the pertinent periods is not clearly erroneous.

The Santa Fe seep is north of the impounding basin on land which in 1961 was in the possession of the railroad. Presence of oil in the seep for many years is not contested. Because of the proximity of the Skelly refinery to the seep, the plaintiffs claim that petroleum and chemical products passed through the subsurface and were collected in the seep. No direct proof was made of this subsurface drainage and the claim rests on inference. A witness for Skelly testified that he did not know the source of the oil appearing in the seep. The washing of the seep by the flood waters is immaterial to the liability of Skelly in the absence of proof that the pollutants in the seep came from the Skelly property. We share the amazement of the trial court that in view of the age of the seep and its importance in the litigation, the source of the pollutants therein was not identified. The inference of the plaintiffs shows no more than a possibility that the oil came from the Skelly refinery. A possibility is not enough to sustain liability. The trial court rejected the plaintiffs' inference and we cannot say that such rejection was unreasonable.

Skelly's Effluent No. 2 discharges water obtained from the stream, stored in ponds, and used for fire fighting purposes. No evidence shows any oil in the ponds or in the effluent. We are convinced the finding that the effluent was not a source of pollution is not clearly erroneous.

The last claim with regard to Skelly is based on subsurface pools of oil, shallow wells, and sumps on the refinery property. Skelly's refinery manager testified that no oil escaped from the refinery during the floods. Our attention is directed to no evidence of either surface or subsurface drainage from refinery wells or sumps which contributed to the pollution during the floods either by direct drainage or by drainage to off-property areas such as the Santa Fe seep. Again the evidence of the plaintiffs fails. At the most it shows only possibilities and they are not enough.

We turn now to the case against Petrofina. Plaintiffs say that oil entered drainage ditches leading from and bor-

dering the property and found its way to the West Branch. One witness testified that he lived near Petrofina; that oil came on his property after each flood; that after the July flood he traced the oil to Petrofina; and that he saw oil in one of the drainage ditches, on the weir through which the ditch drains, and along the railroad tracks adjacent to Petrofina. A reading of the testimony of this witness persuades us that the finding of the trial court that the testimony was inconsistent and contradictory is justified.

A Santa Fe railroad maintenance foreman who patrolled the area during both floods observed oil on the West Branch above Petrofina but saw none escaping from Petrofina or the ditches. A state geologist saw no oil escaping from Petrofina. The refinery superintendent described the refinery facilities and said that no oil went over the weir during either flood. Plaintiffs called attention to a small oil seep near the West Branch but produced no evidence as to its source and no analysis to indicate seepage from refinery operations. The court found that the plaintiffs had failed to establish by a preponderance of the evidence the presence of any oil which escaped from Petrofina at pertinent times and which could be a source of pollution of the Walnut. This finding is sustained by substantial evidence.

Cities Service does not operate a refinery in the area but has production from various oil leases. The bulk of these are in the Oil Hill area, where there are other leases besides those of Cities Service. Plaintiffs claim both surface and subsurface drainage from the Oil Hill leases to Constant Creek. Their evidence disclosed oil stains on various leases and along Constant Creek tributaries. Below Oil Hill is the American Legion Golf Course on which is a sink hole from which oil was washed in the floods. Two disinterested witnesses said that they observed the Constant from a bridge below Oil Hill and above the sink hole and saw no evidence of oil escaping from the leases during the 1961

floods. The plaintiffs' theory of subsurface drainage is that oil seeped into subsurface channels in the limestone and emerged at the sink hole. This subsurface drainage has to be inferred from a general drainage pattern and even if the inference is drawn, the oil is not identified as coming from the Cities Service leases rather than from others in the area. The finding of the trial court that the plaintiffs failed to establish the claimed drainage is not clearly erroneous.

Plaintiffs also assert pollution by drainage from the Risley lease, which is located several miles down the Walnut River from El Dorado. Their witnesses tended to establish the possibility of drainage. They were contradicted not only by Cities Service employees but also by an independent pumping contractor who operated leases adjacent to Risley. The conflict was resolved in favor of Cities Service. The trier of the facts determines the credibility of witnesses, and we are bound thereby.

The final claim against Cities Service relates to claimed drainage from the Moyle lease, which is in the general area of the Risley. It is enough to say that here again the trial court resolved conflicting testimony in favor of Cities Service.

The trial court's holding that the defendants are not liable is bolstered by evidence of independent sources of oil which are unrelated to the operations of any of the defendants. During the May flood, the Santa Fe maintenance foreman saw substantial quantities of oil in the West Branch above the Petrofina refinery, which is the farthest upstream of any pertinent activity of any defendant. The evidence shows that during the July flood substantial quantities of oil came to the stream from what is known as the Halliburton Pit, with which no defendant had any connection. Another independent source is the sink hole on the Legion Golf Course, which added to stream pollution during the flood periods.

In the final analysis, the case of the plaintiffs rests upon conjecture as to the sources and destination of the claimed pollutants. Kansas has held in an oil pollution case that a judgment based on conjecture and speculation cannot stand. Williams v. Gulf Oil Corporation, 152 Kan. 672, 107 P.2d 680, 681. The plaintiffs attempt by this appeal to gain a retrial of factual issues which the district court resolved against them. We are bound by the clearly erroneous standard and its application must comply with the recent admonition of the United States Supreme Court, Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, that:

> "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.' "

We are not so convinced.

The remaining arguments of the plaintiffs go to the disqualification of the trial judge and the general conduct of the trial. Little need be said.

The trial began on August 8, 1966, and was concluded on November 2, 1966. The court's findings of fact and conclusions of law were filed on October 2, 1967. On November 10, 1967, the plaintiffs filed an affidavit and certificate under 28 U.S.C. § 144 asserting the bias and prejudice of the judge. After consideration of the application, the judge refused to disqualify himself.

Section 144 requires that the application be timely and be filed at least ten days before the beginning of the term when the proceeding is to be heard or that "good cause * * * be shown for failure to file it within such time." Plaintiffs argue that good cause was shown because the incidents establishing bias were cumulative. Sixteen of the incidents occurred before or during trial, and the remainder of the complaints relate to the findings of fact and conclusions of law. Promptness in asserting disqualification is required to prevent a party from awaiting the outcome before taking action. In re United Shoe Machinery Corporation, 1 Cir., 276 F.2d 77, 79. These plaintiffs withheld action until a month after the case was decided against them. Such an application comes too late. Pacheco v. People of Puerto Rico, 1 Cir., 300 F.2d 759, 760; see also Scott v. Beams, 10 Cir., 122 F. 2d 777, 789, cert. denied Brady v. Beams, 315 U.S. 809, 830, 62 S.Ct. 794, 86 L.Ed. 1208.

Additionally, § 144 refers to "personal bias or prejudice." The complaints of the plaintiffs relate to actions and statements during the proceedings. They reflect the judge's attitude and reactions to incidents then occurring. They do not reflect any personal feeling for or against any party or any attorney. To sustain disqualification the bias and prejudice must arise from an "extrajudicial source" and result in an opinion "on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778. Here the complaints all have their origin in judicial proceedings and the decision was on the record made in the judicial proceedings.

The general attack on the conduct of the trial does not impress us. The trial court showed unusual patience and gave the parties every opportunity to produce their evidence. Its findings and conclusions disclose a careful consideration of all the evidence and all the issues.

Affirmed.