UNITED STATES of America, Plaintiff,

v.

Gregory ALBERICO, Defendant.

Crim. Nos. 77–CR–237 to 77–CR–240.

United States District Court,
D. Colorado.

Dec. 23, 1977.

Joseph F. Dolan, U. S. Atty., Rodney W. Snow, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Walter L. Gerash, Denver, Colo., for defendant.

MEMORANDUM OPINION AND ORDER

WINNER, Chief Judge.

These four cases were consolidated for trial and defendant was convicted by jury verdict of six of the seven felonies charged. The jury returned a not guilty verdict on

the seventh charge. A motion to disqualify me has been filed, and it seems appropriate that preliminarily to ruling on that motion I talk at length about the troubled history of these cases. I choose 77–CR–240 to capsulize that history.

Defendant's bond was originally fixed at $50,000, but it was reduced to $15,000 by the magistrate. After further proceedings before the magistrate, the first thing I had to do with the case was raised by a motion seeking relief as to the preliminary hearing. The preliminary hearing became somewhat unimportant after the return of indictments on August 12, 1977. Defendant was arraigned and pleaded not guilty on August 16, 1977. Our local rules require the filing of motions within 10 days of arraignment, but to accommodate defendant and his lawyer, the time for motions was doubled which gave defendant 20 days for his motions. On August 18, 1977, trial was set for the week of November 7, 1977. Eleven motions were filed on September 2, 1977, and they were set for hearing on October 5, 1977. Then, on September 12, a superseding indictment was filed and the defendant again entered not guilty pleas on September 15, 1977. It was agreed that the motions theretofore filed should be deemed directed to the superseding indictment, and the hearing date of October 5, 1977, was confirmed. October 4, 1977, defendant asked to continue the hearing, but this request was denied, and the motions were heard on the scheduled date. Some motions were granted while some were denied. Defense counsel argued that the place of trial should be changed because of pretrial publicity. I thought that the publicity hadn't been all that bad, but, to be absolutely sure that the defendant was not prejudiced, I changed the place of trial to Grand Junction, Colorado, commencing November 7, 1977. This meant two trials, because the co-defendant wanted to be tried in Denver.

Not long thereafter, defense counsel informally advised me that he had a conflicting trial setting and asked that the trial start midweek instead of November 7th. I agreed to this. Later, at defense counsel's request, the trial was put over to November 14, 1977. There was another flurry of motions on November 8, 1977, and these were opposed in writing by the government. It was on November 8, 1977, that defense counsel first charged "governmental misconduct," because he alleged that certain material hadn't been furnished to him as part of the discovery process. With the trial firmly set to commence in less than a week, and with jurors from throughout the entire western slope of Colorado summoned to appear in Grand Junction on November 14, 1977, I heard the November 8th motions on Wednesday, November 9th. They were denied. On either November 10th or November 11th, I was advised by defense counsel that a plea bargain had been agreed to. I insisted that the plea be entered before November 14, 1977, the scheduled trial date.

Defense counsel made an ex parte visit to my chambers in which he proposed that I agree to accept a guilty plea and that I promise to continue sentencing until after January 1, 1978, to assist defendant in obtaining his Army pension. I told counsel in chambers, and later on the record in open court in defendant's presence that I would not be a party to any such agreement. Whether defendant gets or does not get his pension is something I will having nothing to do with—either in this case or in any later litigation which may ensue.

The guilty plea was entered without promises on my part. We have adopted the practice in this court of having a defendant who wants to plead guilty sign a statement intended to cover anything mandated by Rule 11, F.R.Cr.P. Defense counsel must also sign the statement, and a copy of the form statement signed by Alberico and his lawyer was filed in support of the plea of guilty to Count 2 in Case No. 77–CR–240. I was determined to make an adequate oral record to support the guilty plea, and, although an oral record in addition to the written statement is always made, I went into a bit more detail on Alberico's plea than is customary with me. I left the courtroom thinking these troublesome cases were done with, and by diligent use of the

long distance telephone over the weekend, the Clerk's office was able to contact summoned jurors to keep them from needlessly reporting in Grand Junction the following Monday.

When the guilty plea was entered, sentencing was set for November 28, 1977, but on November 22, a motion was filed asking that the sentencing be continued until December 9th. The motion recited "that this motion is not made with any effort to delay or enhance any collateral administrative action on behalf of defendant," but, I was unpersuaded that the sentencing should be continued and I denied the motion. The day for sentencing under the guilty plea came, and when defendant appeared before the court, he and his counsel asked to withdraw the guilty plea. Despite the fact that I understand the law to be that requests to withdraw guilty pleas made before sentence is imposed should be treated liberally, I did not think that the showing made by defendant was sufficient to require that withdrawal of the plea be allowed. Nevertheless, I bent over backwards once more, and I let defendant withdraw his plea.

Trial was set to commence on December 5, 1977, in Grand Junction, and once more the Clerk's office went to work on the long distance telephone to round up sufficient jurors.

On Thursday, December 1, 1977, defendant filed a "Notice Pursuant to Rule 12.2" of an intent to offer psychiatric testimony in support of a possible defense of entrapment. It is to be remembered that Rule 12.2(b) provides:

"If a defendant intends to introduce expert testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, *within the time provided for the filing of pretrial motions* or at such later time as the court may direct, notify the attorney for the government *in writing* of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

Of course, the extended time for filing pretrial motions had expired many months earlier, but I did not sustain the government's request to block off the defense. Instead, I said that I would receive the psychiatric testimony during the trial and out of the presence of the jury. I agreed to rule on the request to permit that testimony after I heard it. I did so, and, again, I resolved the serious doubts I had as to the admissibility of the testimony in defendant's favor and the jury heard all that I had heard out of the jury's presence plus a lot more that I hadn't heard. I shall say nothing further concerning this, because the circumstances are argued by defendant as a ground for a new trial.

Friday, December 2, 1977, still another motion for continuance was filed. It said that the psychiatrist would need a week to examine the so-called § 3500 material, and that the material had just been received. [Of course, the material required to be furnished under 18 U.S.C. § 3500 can't be ordered furnished prior to completion of the testimony of the witness in question, and the early delivery of the material was a courtesy to defense counsel afforded by the United States Attorney.] In this motion, counsel said as to his client, "The federal investigative material . . . reveals material indicating that the defendant is either the world's biggest liar and storyteller, or a man gone berserk." The December 2, 1977, motion for a continuance was denied, with the promise that if the government's case didn't take up all of the week of December 5, 1977, I would recess the trial to give the psychiatrist the time he said was needed to read over the statements. The government's case did take all week, the psychiatrist was ready to go when called, and I didn't have to recess.

The case was called for trial on December 5, 1977, as scheduled, and defendant opened with a final motion for a continuance. I denied it, and we got the trial started.

During the trial certain video tapes were received in evidence without objection, and

the jury watched and listened to them. They were received commencing December 6, 1977, and custody of those tapes was carefully preserved at all times. Copies of the tapes are alleged to have been made available to Channel 4, KOA–TV by the prosecution, and excerpts were shown on the newscasts. Nothing was shown to the public the jury had not already seen, but a motion for a mistrial was made the following morning. The jury had not been sequestered, and inquiry was made of the jury as to whether any juror had seen the newscasts in question, whether any juror had talked to anyone about them or whether anyone had mentioned the newscasts to a juror. The jurors' unanimous response was negative and the mistrial motion was denied. The same thing happened the next day, and before inquiry was made of the jurors, defense counsel said that the jurors might be afraid to give honest answers because of fear of punishment. I took care of this by assuring the jurors that there would be no punishment if an affirmative answer were given by any juror, but once more the jurors' answers were unanimously negative, and I again denied the mistrial motion.

Defendant sought relief in the Court of Appeals by way of a writ of prohibition. This was filed December 8, 1977, and it was denied with assurance that the matter could be raised on appeal. I am sure that it will be if the case is appealed.

I neither authorized nor prohibited release of copies of the tapes, although I had been told that copies would be given to the media once they had been received in evidence. I was and am quite happy that I was not confronted with a request by the media to copy the actual tapes received in evidence. I do not say what I would have done because the question is not before me, but I strongly suspect that the law would permit the media to copy the original tapes once they became a part of the public domain by being offered and received in evidence.

I have been down a parallel road once before, and I agonized over a media pur-

chase order for a reporter's transcript of *pretrial* testimony in a case of some notoriety. The media freely admitted that the purchase order was intended to add to the *pretrial* publicity, and I concluded that if the requirements of the First Amendment were to be met, the media has an absolute right to have prepared for it a transcript of that which took place in court in connection with *pretrial* proceedings. Under those circumstances, there is a real risk of contamination of a juror's mind, but where the jury has already been selected and cautioned, there is slight chance of that prejudice—especially when the jury has already seen and heard an unexpurgated version of that which the public was shown. I confess, and I said on the record, that the publicity may make more difficult the trial of the co-defendant which is yet to come, but unless a juror saw, heard, discussed, or was told about the playing of the tapes on television, I am unable to perceive how the defendant was hurt, nor do I see how he has much standing to argue "pretrial publicity" cases when the publicity occurred during the trial—something I shall have more to say about presently. Yet, in the petition for a writ of prohibition, this is what defense counsel assigned as a reason to "retrieve" the tapes and to prevent the playing of tapes which had already been shown to the jury and had been twice shown by Channel 4:—

". . . so that the Channel 4 media does not for the third time prejudice the rights of the defendant, and influence *future* jurors who may be selected from a jury pool in case a mistrial takes place or if the case is reversed, and also further prejudice the children, the spouses, the relatives and the neighbors of the present jurors due to peer pressure being exerted upon the jurors. . . ."

As I have mentioned, I have heretofore been confronted with a similar problem when a newspaper ordered a reporter's transcript of a *pretrial* evidentiary hearing, and I concluded that the media could obtain such a transcript. I wrote an opinion in that case, *United States v. Smaldone, et al,*

75–CR–137, and I attach a copy of it as Exhibit A at p. ——. I quoted at length in that opinion from that which Justice White said in *Cox Broadcasting Corporation v. Cohn*, (1975) 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 and I quoted his quotation of Justice Douglas in *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546:

> " 'A trial is a public event. *What transpires in the courtroom is public property.* If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we see no different though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. *There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit or censor events which transpire in proceedings before it.' "*

Justice White said:

> "*Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it. . . .*"

I doubt that I could have turned down a media request to copy the video tapes actually received in evidence, and I am sure that I couldn't order KOA–TV not to play copies of tapes which had been received in evidence, had been seen by the jury, and were, in the language of Justice Douglas, "public property."

Those were my views in 1975 when I wrote my opinion in *Smaldone*, a case which was affirmed by the Tenth Circuit without mention of this point. I wrestled with the problem at that time, but the question would have been of much simpler resolution if as of that date the Supreme Court had decided *Nebraksa Press Ass'n v. Stuart* (1976), 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 183. A reading of that case convinces me that it is only when *pretrial* publicity is challenged that a party *may* have some very slight rights to limit the media, although even with *pretrial* publicity it would require the most egregious facts to permit imposition of even a very modest restraint. However, when the publicity has to do with an ongoing trial, prior restraint of the right of the media to publicize that which goes on in an American courtroom would be gross, autocratic abuse of power. [In cases involving juveniles there may be some exceptions to this rule.] I think that I was, and I think that I am and I think that I will continue to be without right or power to censor that which happens in my courtroom. Most assuredly, I can't impose prior restraint by ordering that the press cannot obtain from counsel copies of that which has become *public property.*

I suppose that there is always possibility that a juror's mind will be contaminated by publicity which occurs during the trial, and the ultimate safeguard against this is sequestration. Occasionally, sequestration may be the only safeguard, but it represents a gross interference with jurors' lives and it costs the taxpayers a lot of money. My experience is that jurors are honest; that when it is impressed upon them that they are to remain free from outside influences, they do so. In this case, at defense counsel's request, the morning following the television playing of the tapes the jury had already seen, inquiry was made of the jurors in the exact vein requested by defense counsel. The inquiry convinced me that there had been no invasion of the jurors' privacy, and defense counsel asked for no further inquiry. The First Amendment rights of the media are not to be trifled with, and never was this principle more strongly expressed than in *Nebraska Press Ass'n v. Stuart, supra,* where the Chief Justice said:

> "The Sixth Amendment in terms guarantees 'trial, by an impartial jury . . .' in federal criminal prosecutions. Because 'trial by jury in criminal cases is fundamental to the American scheme of justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions. *Duncan v. Louisiana*, 391 U.S. 145, 149 [88 S.Ct. 1444, 1447, 20 L.Ed.2d 491] (1968).

'In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. . . . "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." *Co. Litt.* 155b. His verdict must be based upon the evidence developed at the trial.' *Irvin v. Dowd*, 366 U.S. 717, 722 [81 S.Ct. 1639, 1642, 6 L.Ed.2d 751] (1961)."

The Court quoted from *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600:

"Of course, there is nothing that proscribed the press from reporting events that transpire in the courtroom."

It is noteworthy that one keystone for the opinion in *Nebraska Press Ass'n* is part of Colorado's legend. Chief Justice Burger commented that in *Near v. Minnesota* (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357:

"The Court relied on *Patterson v. Colorado ex rel Attorney General* (1907), 205 U.S. 454 [27 S.Ct. 556, 51 L.Ed. 879]; 'The main purpose of the First Amendment is "to prevent all such *previous restraints* upon publications as had been practiced by other governments." ' " (italics by the court.)

Nor can a prior restraint be justified by an argument that it is "only temporary." As was noted in *Nebraska Press Ass'n*, the Supreme Court took care of that contention in *New York Times Co. v. United States*. In *Nebraska Press Ass'n.*, the Chief Justice added:

"The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protec-

tions afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative.

"A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.

"The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. *Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment.* See *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492–493 [95 S.Ct. 1029, 1044–1045, 43 L.Ed.2d 328] (1975); see also, *Craig v. Harney*, 331 U.S. 367, 374 [67 S.Ct. 1249, 1254, 91 L.Ed. 1546] (1947). *For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings, whether the crime in question is a single isolated act or a pattern of criminal conduct.*

'A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. *The press does not simply publish information about trials, but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.*' *Sheppard v. Maxwell*, 384 U.S., at 350 [86 S.Ct., at 1515].

"The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First

Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors."

I fully subscribe to the proposition that the press has the duty to try to insure a defendant a fair trial, but I am unable to discern any violation of that duty when *copies* of material a jury has seen already are shown to the public and when protections have been afforded against a juror seeing the excerpts selected by the media. I discussed in *Smaldone* and the Supreme Court discussed in *Nebraska Press Ass'n.* the standards for "free press-fair trial" worked out by bar and press associations. I find nothing violative of those standards here. The purpose of the standards is to protect against contamination of a prospective juror's mind by reference to material which may not be admissible in evidence. No standard even hints that the media can't report evidence which has been received in open court, which has been seen by the jury in open court, and the media reporting of which was not known to the jury.

If there was any impropriety in the release to the media of *copies* of that which had been received in evidence—copies of that which the Supreme Court has described as "public property"—that question is going to have to be reached in a separate proceeding, and it won't be tried as a matter collateral to the criminal trial of this defendant. If the defendant can show *contamination of his trial* because of publication of copies of the tapes received in evidence, I will listen to it as part of the motion for new trial, but I will not try out the question of the propriety of method by which KOA–TV obtained the tapes. That is something to be decided at another time before another tribunal. KOA–TV [and I suspect most of its media competitors] have a vital interest in this First Amendment question, and resolution of that question forms no part of the criminal cases which were tried unless it is shown that there was actual prejudice to the defendant in the trial which resulted in his conviction. Any collateral claim that the prosecutor's release of copies of the tapes was improper isn't going to permit further delay in reaching a final result in these cases.

I will not pass upon the question of the propriety of the method by which KOA–TV obtained the tapes. I will not pass upon it in this case. I will not pass upon it in any later case. It is not and cannot come before me in this case, and I would not sit in any future case in which the claim is properly raised. I will decide whether defendant was prejudiced, but I will do that in ruling on the pending motion for a new trial. If a new trial is granted, we will then have to decide what should be done about selecting another unbiased jury. [The selective verdicts of the jury in these cases demonstrates to me discernment and lack of bias.] If the new trial motion is denied, the entire case will be before the Court of Appeals for total review, and in acting on the petition for a writ of prohibition that Court has already said that it will carefully study the problem on appeal. Unless ordered so to do by an appellate court, I am not going to tolerate further substantial delay in this case to litigate matters which I think are at best collateral to the question of defendant's guilt or innocence, and which I think form no part of the criminal cases *unless defendant can demonstrate actual prejudice to him.* Insofar as this case is concerned, questions concerning publication of the tapes are of no interest to defendant unless he can show how he was hurt.

I should mention that on December 21, 1977, Mr. Gerash caused a subpoena to be served on me to appear and testify before myself at the hearing scheduled for December 28, 1977. Formal service was made and I was tendered a check signed by Mr. Gerash to pay me for testifying in the case over which I am presiding. I cannot lay claim to meeting the test for the highest rank under Orphic Saying No. 12, and I admit that I was tempted to keep the check, but I sanctimoniously overcame the temptation and returned the check.

I know that counsel was laboring under the stress of time pressures, but I invite attention to *Rule 605 of the Federal Rules of Evidence* :

"The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."

I shall follow *Rule 605 of the Federal Rules of Evidence.*

I shall also follow *Rule 606,* and I think that the "extraneous prejudicial information" matter was pretty well covered during the trial.

Way back on page 1 of this opinion and order, I said that I was going to talk at length about the history of these cases, and I have talked too long before reaching the motion seeking to disqualify me. I finally reach it.

■ Disqualification is sought under 28 U.S.C. § 455(b)(1). That statute reads:

"(b) He (a judge) shall also disqualify himself in the following circumstances:

"(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

"(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

"(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy.

"(4) He knows that he, individually, or as a fiduciary or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

"(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person:

"(i) is a party to the proceeding, or an officer, director, or trustee of a party;

"(ii) is acting as a lawyer in the proceeding;

"(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

"(iv) is to the judge's knowledge likely to be a material witness in the proceeding."

Since the motion is verified and is supported by a certificate of counsel, I suspect that it is intended as one filed under 28 U.S.C. § 144 which is the only section requiring the verification and certificate and which is the only section which provides for motions to disqualify a judge. That statute reads: [1]

"Whenever a party to a proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within that time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

If, after a trial, a convicted defendant can force a judge to disqualify himself and thus stave off ruling on a motion for new trial and leave the case in limbo, our system

---

1. See, *United States v. Ritter* (1976) 10 Cir., 540 F.2d 459, for a comparative discussion of the two statutes.

of criminal justice has come upon sorry days. To say that a defendant and his lawyer can by such shenanigans delay the day of judgment until a reporter's transcript of a long trial has been prepared, has been reviewed and ruled on by some other trial judge and until all collateral matters have been litigated and appealed through the highest court would be to approve a mockery of justice. Our judicial system should not bring down upon itself the wrath which would explode from any such ruling.

The affidavit charging bias and prejudice says that I am biased because I "am a material witness." That may be the view of defendant and his lawyer, but it wasn't the thinking of the Supreme Court when it adopted Rule 605 of the Federal Rules of Evidence. Rule 605 says, "the judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." I am going to follow Rule 605, and I am not going to testify in a matter pending before me. Defendant's claim of a right to subpoena the trial judge after jury verdict, if accepted, would mean that any convicted defendant could stymie the judicial process by saying that he wanted the judge to testify about what happened during the trial. This would automatically prevent the sentencing of the defendant for a long time. I don't understand that to be the law, and I am not going to testify in *these* cases. I will cherrily appear without subpoena to testify in *another* case as to any relevant facts I may know about, but all I want to know about in these cases is whether defendant was actually prejudiced. The circumstances surrounding the release of the copies of the video tapes don't bear on that issue.

The next part of defendant's affidavit leaves a little to be desired as a matter of grammar. It says that my failure to impose a prior restraint on the media by an ex parte order prohibiting the United States Attorney from giving the media copies of public property, "biased the defendant, his family, and a *future* jury pool, to the prejudice of the defendant." [I don't question defendant's bias.] As I said, I have some problem with the grammar, but it is to be noted that defendant charges only that a "future jury pool" could be affected. As to the co-defendant, there will be a future jury pool, but there is at least an outside chance that there will be no "future jury pool" concerned with Mr. Alberico's fate, and it could be that his convictions will stand. If they don't it will be time enough to see if there is juror bias at the time of a second trial.

The affidavit refers to statements allegedly made by me. The record is going to have to show what statements I actually made and whether they are fairly characterized in the motion and affidavit, but the record will show that my comments in the areas objected to were all made outside the presence of the jury and that they had to do with matters which were already a part of the record in the case. Many of them referred to things argued by defense counsel in seeking delays in the trial of the case, and I wouldn't have known anything about the Army pension if defense counsel hadn't tried to make a sub rosa deal to delay sentencing. Although the proposition was made ex parte in chambers, it was put on the record within minutes thereafter, and the record will speak for itself.

Any comments I made about the Federal Bureau of Investigation were made in ruling on defense counsel's attacks on that organization and its members—attacks I thought were scurrilous. It is to be remembered that the sole defense to major counts was the defense of entrapment, and in arguing matters concerning that defense out of the jury's presence, defendant's lawyer made charges against the F.B.I. which I thought were unfair, uncalled for, and unfounded. I knew not how to rule on the motions then placed before me by defense counsel without commenting on the accusations made by him in support of what was argued as being "entrapment as a matter of law." See, *United States v. Swets* (1977) 10 Cir., 563 F.2d 989, *United States v. Rosenfeld* (1976) 10th Cir., 545 F.2d 98, *United States v. Gurule* (1975) 10th Cir., 522 F.2d 20, *United States v. Spivey* (1975) 10th Cir., 508 F.2d 146, and *United States v. Hawke*

(1975) 10th Cir., 505 F.2d 817, plus the many cases therein discussed. The most recent decision of the United States Supreme Court in the entrapment field is *Hampton v. United States* (1976) 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, and it goes right down the line of the many Tenth Circuit cases. To me, these cases show why comment was necessary in ruling on motions heard out of the jury's presence.

[Mention of *Hampton* makes appropriate parenthetical comment in connection with my insistence that before the charge of governmental impropriety will be considered, there must be some showing that defendant was hurt. Justice Rehnquist said in *Hampton*, "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the government activity in question violates some protected right of the *defendant* (italics by the court)."]

I have read every Tenth Circuit case spewed out by that modern miracle, LEXIS, which, according to the computer, makes mention of 28 U.S.C. § 144. I comment on only a few of those cases.

I glean from the earlier application for a writ of prohibition and from some of the language of the motion and affidavit filed seeking to disqualify me a hint that I am going to get sued, and I already have been sued in the application for a writ of prohibition. However, *United States v. Grismore* (1977) 10th Cir., 564 F.2d 929, says, "A judge is not disqualified merely because a litigant sues or threatens to sue him."

Read in the light most favorable to defendant, it seems to me that what defendant complains about is limited to my alleged trial errors and to things I learned about in the course of the pretrial and trial proceedings in the case. That being so, the language of *United States v. Irwin* (1977) 10th Cir., 561 F.2d 198, is apropros. This is what Judge Hill said:

> "Irwin next argues that the trial judge erred in failing to recuse himself on the basis of Irwin's affidavit of prejudice. Section 144, Title 28 U.S.C., provides that a trial judge against whom a time and

sufficient affidavit is filed in good faith by a party demonstrating bias or prejudice against him or in favor of his adversary shall not hear the proceeding. *The bias charged must be of a personal nature and must be such as would likely result in a decision on some basis other than what the judge learned from his participation in the case. United States v. Grinnell Corp.*, 384 U.S. 563, 85 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Davis v. Cities Service Oil Co.*, 420 F.2d 1278 (10th Cir. 1970)."

*United States v. Bray* (1976) 10th Cir., 546 F.2d 851, pretty much covers the waterfront of the law on disqualification. It holds:

> "The simple filing of an affidavit does not automatically disqualify a judge. *United States v. Townsend*, 478 F.2d 1072 (3rd Cir. 1973). *A trial judge has as much obligation not to recuse himself when there is no reason to do so as he does to recuse himself when the converse is true. United States v. Ming*, 466 F.2d 1000 (7th Cir. 1972), cert. denied, 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176 (1972); *United States v. Diorio*, 451 F.2d 21 (2nd Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). An affidavit must comply with § 144 before it can effectively disqualify a judge. *United States v. Anderson*, 433 F.2d 856 (8th Cir. 1970). And although a court must pass on the legal sufficiency of an affidavit, [*Wolfson v. Palmieri*, 396 F.2d 121 (2d Cir. 1968)], all factual allegations must be taken as true [*Action Realty Co. v. Will*, 427 F.2d 843 (7th Cir. 1970)], notwithstanding a judge's desire to challenge the validity of the affidavit. *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation*, 507 F.2d 1281 (8th Cir. 1974). "Bray's affidavit of prejudice alleged, *inter alia*, that he had obtained 2000 signatures of persons desiring the removal of the judge; that he had written an article calling for the impeachment of the judge; that he had a prior case dismissed by the judge; that he had written a protest tele-

gram against the judge; and that he had filed a brief with the court accusing the judge of bribery, conspiracy, and the obstruction of justice. Bray argues that these actions prejudiced the judge against him or that they 'must have' so prejudiced the judge.

"Affidavits of disqualification must allege personal rather than judicial bias. *United States v. Thompson*, 483 F.2d 527 (3rd Cir. 1973). They must contain more than mere conclusions. They must show facts indicating the existence of a judge's personal bias and prejudice. *Knoll v. Socony Mobil Oil Company*, 369 F.2d 425 (10th Cir. 1966), cert. denied, 386 U.S. 977, 87 S.Ct. 1173, 18 L.Ed.2d 138 (1967); *Inland Freight Lines v. United States*, 202 F.2d 169 (10th Cir. 1953). Motions alleging bias and prejudice on the part of a judge which establish simply that the affiant does not like a particular judge are not adequate to require disqualification. *United States v. Goeltz*, 513 F.2d 193 (10th Cir. 1975), cert. denied, 423 U.S. 830, 96 S.Ct. 51, 46 L.Ed.2d 48 (1975).

. . . . .

"To sustain disqualification under § 144, *supra*, there must be demonstrated bias and prejudice of the judge arising from an 'extrajudicial source' which renders his trial participation unfair in that it results in an opinion formed by the judge on the merits of some basis other than that learned from his participation in the case. *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Davis v. Cities Service Oil Company*, 420 F.2d 1278 (10th Cir. 1970)."

Having in mind that the disqualification motion comes post trial, *Davis v. Cities Service Oil Co.* (1970) 10th Cir., 420 F.2d 1278, should be noted. The Tenth Circuit there said:

"The remaining arguments of the plaintiffs go to the disqualification of the trial judge and the general conduct of the trial. Little need be said.

"The trial began on August 8, 1966, and was concluded on November 2, 1966. The court's findings of fact and conclusions of law were filed on October 2, 1967. On November 10, 1967, the plaintiffs filed an affidavit and certificate under 28 U.S.C. § 144 asserting the bias and prejudice of the judge. After consideration of the application, the judge refused to disqualify himself.

"Section 144 requires that the application be timely and be filed at least ten days before the beginning of the term when the proceeding is to be heard or that 'good cause * * * be shown for failure to file it within such time.' Plaintiffs argue that good cause was shown because the incidents establishing bias were cumulative. Sixteen of the incidents occurred before or during trial, and the remainder of the complaints relate to the findings of fact and conclusions of law. Promptness in asserting disqualification is required to prevent a party from awaiting the outcome before taking action. *In re United Shoe Machinery Corporation*, 1 Cir., 276 F.2d 77, 79. These plaintiffs withheld action until a month after the case was decided against them. Such an application comes too late. *Pacheco v. People of Puerto Rico*, 1 Cir., 300 F.2d 759, 760; see, also *Scott v. Beams*, 10 Cir., 122 F.2d 777, 789, cert. denied *Brady v. Beams*, 315 U.S. 809, 830, 62 S.Ct. 794, 86 L.Ed. 1208.

"Additionally, § 144 refers to 'personal bias or prejudice.' The complaint of the plaintiffs relate to actions and statements during the proceedings. They reflect the judge's attitude and reactions to incidents then occurring. They do not reflect any personal feeling for or against any party or any attorney. To sustain disqualification the bias and prejudice must arise from an 'extrajudicial source' and result in an opinion 'on some basis other than what the judge learned from his participation in the case.' *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778. Here the complaints all have their origin in judicial proceedings and the decision was on the record made in the judicial proceedings.

"The general attack on the conduct of the trial does not impress us. The trial court showed unusual patience and gave the parties every opportunity to produce their evidence. Its findings and conclusions disclose a careful consideration of all the evidence and all the issues."

I could go on with quotations from many other Tenth Circuit cases and with quotations from innumerable cases from other circuits, but I think that I have quoted just about enough. I close with a quotation in *United States v. Grinnell Corp.* (1966), 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case." I do not think that the affidavit and motion filed in this case meet these requirements, and I think that it is not timely to seek to disqualify a judge after a jury verdict. Any errors made by a trial judge during trial should be reached by prompt direct appeal of the case and not by a diversionary tactic of a motion to disqualify.

No judge relishes having an attack made on his impartiality, and I along with most other judges, will not try a case if any ethical member of our bar makes a *timely* suggestion that he, she or the client would prefer that the matter not be heard by the judge to whom it is assigned. This is because of my belief and the belief of my fellow judges that public confidence in the courts is essential to our way of life. However, I think that it would be equally destructive of public confidence if I were to permit the lawyer for a defendant who stands convicted by jury verdict of six felonies to force me out of a case on the basis of the motion and affidavits here filed after the convictions were obtained. I think that this is particularly true where, (a) the primary complaint is that I didn't step in and impose an unconstitutional prior restraint on the media, and (b) the matter has already been before the Court of Appeals once and that Court has said that defendant can get full review on direct appeal.

I have responsibilities to the defendant, and I think that the record will demonstrate that I have tried to meet them. I also have some responsibilities to the public, and the Tenth Circuit said in *United States v. Bray* (1976), 546 F.2d 851, "A trial judge has as much obligation *not* to recuse himself when there is no reason to do so as he does to recuse himself when the converse is true." I think that there is no reason to recuse myself in this case, and I won't. Defendant's motion to disqualify me is denied.

The motion for a new trial is presently set for hearing on December 28, 1977. If a new trial is granted, an early trial date will be fixed at the hearing on the motion. If a new trial is denied, sentencing will follow immediately. Because of the sensitive nature of any motion to disqualify a judge, I continue the December 28, 1977, hearing on the motion for new trial until 9:00 a. m. on Friday, December 30, 1977. I do this to afford defense counsel reasonable opportunity to apply to the United States Court of Appeals for the Tenth Circuit for relief. I recognize that there is a certain amount of license of advocacy to be used by eager counsel, and I know that there is always room for good faith disagreement as to what took place during a trial. However, I don't remember some of the things which happened during the trial exactly the way defense counsel recited them in his earlier application for a writ of prohibition and the way he recited them in the disqualification motion and affidavit. There is no way we can get a reporter's transcript in time to find whose memory is right, but, when the statements have to do with that which was fully recorded during trial, I hope that 28 U.S.C. § 144 doesn't mean that I am bound to accept defense counsel's memory of recorded trial events without reserving a doubt as to the accuracy of his asserted recollection.

All of this being so, it is ordered that if application be made to the United States Court of Appeals for the Tenth Circuit for any type of writ or extraordinary relief which would or could prevent the hearing

of the motion for new trial on December 30, 1977, a copy of this opinion and order and of its attachments shall accompany that application to the Court of Appeals. If nothing more will be accomplished by adopting this procedure, it will at least suggest to the appellate court that I have not lunged at denying this motion to disqualify, nor have I treated it lightly. I have said, and I repeat, I do not think that I could muzzle the media, and, in final analysis, my failure to issue an indirect gag order on the media is what defendant is complaining about.

### EXHIBIT A
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CRIMINAL ACTION   NO. 75–CR–137

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CLARENCE M. SMALDONE, CAROL JEAN REEB, PAUL CLYDE VILLANO, ALICE WHALEN, LARRY SCOTT OWENS, CAROL JOYCE GARDNER, and JOSEPH NICHOLAS RASO,

Defendants.

### MEMORANDUM OPINION

WINNER, District Judge.

All defendants filed motions claiming prejudicial pretrial publicity. A hearing was held on August 20, 1975, and defendants subpoenaed media representatives and their files. The Denver Post, KOA–TV and KOA–Radio filed motions to quash the subpoenas, but their difficulties were worked out between defense counsel and media counsel. At that hearing, defendants' primary reliance was on a transcript of testimony taken at a March 29, 1974 hearing in another case before another judge. I denied defendants' motions for the stated reasons that the publicity alleged was stale and there was then no reason to anticipate fresh prejudicial publicity. There was some subsequent publicity, and The Denver Publishing Company requested a reporter's transcript of the testimony of a witness who testified at the August 20, 1975, hearing. I directed the court reporter not to prepare the transcript until the parties were afforded an opportunity to approve or object to the furnishing of the transcript.

The government made no objection. All defendants did object. They said:

"   .   .   all of the defendants have filed motions for change of place of trial based upon the question of pretrial publicity. We can only infer that the reason for the Denver Publishing Company's motion is for material with which to publish a story or stories related to the above-captioned matter. It is our view that our failure to object to the preparation and dissemination of said transcript might serve to effectively waive our previous position seeking a change of place of trial, and therefore, are unable to agree to the Court granting the motion referred to above."

Defendants' objection to furnishing the transcript was entirely consistent with their earlier motions and briefs, in one of which the court's attention was invited to *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 60 and *Estes v. State of Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. Counsel quoted from *Sheppard:*

"But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will *prevent the prejudice at its inception.* The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences."

Defense counsel's suggestions as to the preventive steps which should be taken were, (a) "to continue this matter for a time sufficient to chill and douse the prejudicial publicity associated with the Defendant in this action, and with the name Smaldone; (and in the alternative) probably the best remedy would be to transfer the within matter to *another District* for purposes of all further proceedings."

The matter was set for hearing on September 17, 1975, and all counsel, including counsel for the Denver Publishing Company appeared. At that time I was concerned

that the "staleness" test I had earlier relied on would no longer apply and I thought that an appellate court might take a rather dim view of pretrial publicity which was in a sense court engendered. I supplied counsel with a list of cases my research had uncovered, and, with the approval of all counsel, briefs were to be filed by October 20, 1975, and the last brief was filed just under the wire. [One lawyer got mixed up on the deadline and thought briefs could be filed by October 28, 1975.]

My research and counsels' briefs show that the exact question presented is one of first impression. There is a paucity of reported cases even slanting at the problem, and no one can come up with a case directly in point.

In *Ex parte Uppercu* (1915) 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 363, it was held that depositions [and presumably the trial transcript] of a case *which had already been tried* could not be ordered sealed. *Kennedy v. Justice of the District Court of Dukes County* (1969) 356 Mass. 98, 252 N.E.2d 201, dealt with a case which received nation wide publicity. The Supreme Judicial Court of Massachusetts discussed *Sheppard v. Maxwell* and *Estes v. Texas,* and held that the reporter's transcript of an inquest involving the death of one Mary Jo Kopechne could be ordered sealed until the completion of any threatened criminal proceedings or until there was no realistic threat of a criminal prosecution. The transcript was thus effectively sealed for several years. *Lipman v. Commonwealth of Massachusetts* (1972) 1 Cir., 475 F.2d 565, was an outgrowth of *Kennedy v. Justice of the District Court,* and by implication the First Circuit agreed with the Massachusetts Court.

*New York Post Corporation v. Leibowitz* (1957), 2 N.Y.2d 677, 163 N.Y.S.2d 409, answers the argument which has been made that until the transcript is prepared, it is not a "public record." The New York Court of Appeals said:

"The legislature has in no way expressly forbidden a transcript . . . to be furnished to persons other than parties to the action. On the contrary, it has directed that a transcript of the original stenographic notes be furnished by the stenographer to 'a person entitled by law to a copy of the same.' That provision makes it reasonable to infer that the intention was to embrace persons other than parties. Accordingly, to remove the doubts on the score of constitutionality that would be engendered by the restrictive interpretation adopted by the courts below, section 301 of the Judiciary Law and Section 66 of the Public Officers Law should be interpreted as entitling any member of the public to obtain a transcript from the stenographer . . . upon payment of the prescribed fees." [The statutes referred to were New York Public Records laws, and the transcript was post trial.]

*State v. O'Connell* (1967) N. Dakota, 151 N.W.2d 758, and *Garfield v. Palmieri* (1961) D.C.N.Y., 193 F.Supp. 137, are said by some counsel to be contrary to *New York Post Corporation,* but I do not so read those cases, nor, if they so hold, do I agree with them.

*Courier Journal & Louisville Times Co. v. Curtis* (1960) Ky., 335 S.W.2d 934, held that a newspaper did not have standing to demand a reporter's transcript of an *in camera* hearing in a murder case, and I agree with that decision, assuming the propriety of the *in camera* proceeding. However, there is no *in camera* hearing, proper or improper, involved in this case. *Birnbaum v. Wilcox-Gay Corp.* (1953) D.C.Ill., 17 F.R.D. 133 was a civil suit. All pleadings were suppressed and the parties were ordered not to disclose information concerning the case. The court relied on *Sanford v. Boston Herald Traveler Corp.,* 318 Mass. 156, 61 N.E.2d 5, which held:

"It is within the discretion of a court to impound its files in a case and to deny public inspection of them, and that is often done when justice so requires."

An annotation in 175 *A.L.R.* 1260, *"Restricting Access to Judicial Records,"* mentions cases which have sealed proceedings in divorce cases in which scurrilous accusa-

tions were made, and *United Press Association v. Valente,* 308 N.Y. 71, 123 N.E.2d 777, was a New York case with an unusual twist to the question of a right to a public trial. The court held that the defendant, Jelke, had an absolute right to a public trial, but that right was personal to him, and that the press had no standing to assert Jelke's right if Jelke didn't want to.

"Actually, petitioners are seeking to convert what is essentially the right of the particular accused into a privilege for every citizen, a privilege which the latter may invoke independently of, and even in hostility to, the rights of the accused."

The case did not address itself to a pretrial publicity question, and it is at best of only tangential applicability. As I see it, pretrial publicity is a different question from that of a right to a public trial, and I think that the press does have standing to assert its claim to a reporter's transcript of that which took place in open court irrespective of what its rights may or may not be to assert a claim to a right to a public trial. Most assuredly, as I said on August 20, 1975, the press is free to report that which it sees and hears in a courtroom.

All counsel seem to agree that the media's right to a reporter's transcript is subject to some discretionary control on the part of the court. I think that the exercise of any limited discretion should be in conformity with the principles of Compact of Understanding of the Bar and Press of Colorado which recognizes that the media has, "The right to disseminate information . . *with discretion* when public disclosures might jeopardize the ends of justice." To me, "the ends of justice" include *both* the *defendants' constitutional right* to a fair trial and the *public's fundamental right* that the government's case be not prejudiced by unfair pretrial publicity, and I think it is unfair to make an unsupported attack on the Federal Bureau of Investigation and one of its agents. On the record made before me, there is not a scintilla of evidence of unlawful conduct on the part of any federal agent or agency, and I think it unfair to the prosecution's case to imply such misconduct in pretrial publicity even if there were evidence to support the implication. Neither the defendants nor the prosecution should be tried in the newspapers before the case is tried in court.

What is here involved is a potential head-on collision between the right of fair trial and the right of a free press. In a different context earlier this year, Justice White addressed the problem in *Cox Broadcasting Corporation v. Cohn,* (1975) 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328. Under challenge in that case was a Georgia statute prohibiting publication of the name of a rape victim. A radio station reporter obtained the victim's name from the indictment and broadcast it. Suit was filed seeking damages for invasion of privacy by publication, in violation of Georgia law, of the name of the girl who was raped. The statute was held to be unconstitutional, and the Supreme Court said:

"In this sphere of collision between claims of privacy and those of the free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society. Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. We are convinced that the State may not do so.

"In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts

of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. *With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.* See *Sheppard v. Maxwell,* 384 U.S. 333, 350 [86 S.Ct. 1507, 1515, 16 L.Ed.2d 600] (1966).

"Appellee has claimed in this litigation that the efforts of the press have infringed his right to privacy by broadcasting to the world the fact that his daughter was a rape victim. The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

"The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized. This Court, in an opinion written by Mr. Justice Douglas, has said:

'*A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt.* And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit,* or censor events which transpire in proceedings before it. Craig v. Harney,* 331 U.S. 367, 374 [67 S.Ct. 1249, 1254, 91 L.Ed. 1546] (1947) (emphasis added.)'

"See also *Sheppard v. Maxwell,* supra [384 U.S.], at 362–363 [86 S.Ct. 1507, at 1522, 16 L.Ed.2d 600]; *Estes v. Texas,* 381 U.S. 532, 541–542 [85 S.Ct. 1628, 1632–1633, 14 L.Ed.2d 543] (1965); *Pennekamp v. Florida,* 328 U.S. 331 [66 S.Ct. 1029, 90 L.Ed. 1295] (1946); *Bridges v. California,* 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192], 159 A.L.R. 1346 (1941).

.   .   .   .   .

"By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions for the publication of truthful information contained in official court records open to public inspection.

.   .   .   .   .

"Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it. *In this instance as in others reliance must rest upon the judgment of those who decide what to publish or broadcast.* See *Miami Herald Publishing Co. v. Tornillo,* supra [418 U.S. 241], at 258 [94 S.Ct. 2831, at 2840, 41 L.Ed.2d 730].

"Appellant Wassell based his televised report upon notes taken during the court proceedings and obtained the name of the victim from the indictments handed to

him at his request during a recess in the hearing. Appellee has not contended that the name was obtained in an improper fashion or that it was not on an official court document open to public inspection. Under these circumstances, the protection of freedom of the press provided by the First and Fourteenth Amendments bars the State of Georgia from making appellants' broadcast the basis of civil liability."

In *Craig v. Harney,* supra, Justice Douglas said that a newspaper could publish what appeared in a post trial transcript, and in *Cox Broadcasting* Justice White said that "reliance must rest upon the judgment of those who decide what to publish or broadcast." Based upon the research of counsel and on my own research, I am plowing new ground in this case in ruling on a pretrial transcript, and I know that there is risk of reversible error. I accept the risk because I think that I have lessened it by changing the place of trial to Grand Junction, Colorado. If I find during jury selection that there is pretrial publicity contamination of the juror's minds from the standpoint of fairness to *either* side, I will simply have to try to work out a solution to the problem at that time.

I have had no acceptable alternative suggested by anyone. Defendants' request that the trial be moved to another state does not appeal to me, but even less appealing is the thought expressed in one brief that "the court satisfy itself that the Denver Publishing Company intends to treat any article it may print in compliance with the Compact of Understanding of the Bar and Press of Colorado." This to me would be prior restraint and censorship in its most egregious form, and I reject that suggestion out of hand. Equally distasteful to me is the suggestion that I try to restrict names which may be mentioned in any future article. To attempt to do that would be an attempt to censor. As directed by the Supreme Court, I rely on "the judgment of those who decide what to publish or broadcast," and I hope that the rights of both the prosecution and defendants to a fair trial are not put in jeopardy.

The court reporter is authorized to prepare for the Denver Publishing Company a transcript of all or any part of the hearing in this case held on August 20, 1975, and she is authorized to charge therefor the set rates charged to litigants for similar transcripts.

Dated this 22nd day of October, 1975.