UNITED STATES of America, Plaintiff,

v.

James FEENEY, Defendant.

Crim. A. No. 80–CR–54.

United States District Court,
D. Colorado.

Oct. 7, 1980.

See also D.C., 501 F.Supp. 1337.

Joseph F. Dolan, U. S. Atty., Susan R. Roberts, First Asst. U. S. Atty., Denver, Colo., for plaintiff.

Daniel J. Sears, Denver, Colo., for defendant.

Verner, Liipfert, Bernhard & McPherson by Stuart F. Pierson, Washington D. C., for intervenor.

### MEMORANDUM OPINION

WINNER, Chief Judge.

■ As explained in my opinion of September 5, 1980, a copy of which is attached, this case is before me on the second prong of *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and on motion for new trial. Obeying my understanding of the command of the United States Supreme Court, I am permitting inquiry into

all matters which may impact favorably to defendant on the sentence to be imposed. [Another judge ruled that certain evidence was not relevant to guilt, but I deem the evidence to be quite relevant to sentencing, and, if some of the conversations on tape are uncoded, it may be that although their relevance would not appear before deciphering, the conversations may indeed be relevant to guilt, but that remains to be decided.]

Defendant claims that his activities were known to, and were condoned and encouraged by the United States Department of Justice; that prominent persons engaged in illegal activities; that defendant participated in the monitoring of his own conversations with others with the aid and assistance of Department of Justice officials and that presentation of his defense and presentation of testimony in mitigation of punishment has been thwarted by government officials and other persons of prominence. As I have had occasion to explain before, this matter the government says is quite sensitive is a situation of the government's own making. It elected to prosecute defendant, and, when it did, defendant's due process rights became dominant. I have explained to the prosecution that it can, if it wishes, dismiss this case, but so long as I must decide defendant's fate, I shall provide him with all of the rights I think are guaranteed him by the Constitution and by the United States Supreme Court.

It is my intent to permit defendant to present all evidence which is relevant to his sentencing, and, although it is my desire to protect ongoing investigations and grand jury proceedings insofar as possible, it must be remembered that Grand Jury material has been disclosed as it had to be under 18 U.S.C. § 3500, and that disclosure broke the seal of secrecy as to it. Congress has so decreed. Moreover, the interests of justice demand that full inquiry be made into the truth or falsity of the averments of defendant, because, if true, they are in mitigation of sentence and, if uncoded, they may bear on the granting of a new trial on some or all of the counts on which he stands convicted.

In the course of on the record discussions concerning setting this matter for hearing, an invitation was extended to all interested public officials to participate. It appeared that defendant wished to call, among others, Philip B. Heyman, Assistant Attorney General, United States Department of Justice. A subpoena was served on him, but before it was even served, the government filed a motion to quash saying that he is precluded from providing information because of 28 C.F.R. 16.21 and because defendant didn't tell Mr. Heyman in advance what he was going to be asked about. [It would be Valhalla for a private lawyer to be able to get a preview of an adverse witness' cross–examination.] Defense counsel promptly filed an affidavit explaining the scope of the inquiry, at least part of which I think is probably relevant to this proceeding.

Moreover, during the course of the hearing, Department of Justice witnesses have refused to answer because of a direction they have received from the Deputy Attorney General to keep secret information which, by Department of Justice ipse dixit, is classified as immune from judicial process because of an "ongoing investigation." These agency directives of secrecy pose that which is for me a very difficult question. If an agency or its officials can decide what will and what will not be subject to disclosure in a court of the United States, functioning of the courts can be frustrated. I did not rule on the direction given the witnesses to refuse to answer, and I have asked for briefs from all interested parties, although, as I shall explain presently, it may be that I will not reach the question.

I say that because of an ancient rule of law which probably would not apply had the Department of Justice not demanded that some of its officials be excused from testifying and that others be permitted to refuse to answer relevant questions. Before that position was taken by the Department of Justice, the witnesses were equally available to both parties, but now it is crystal clear that they are not and the appropri-

ate evidentiary inferences or presumptions come into play. See, *Gillett v. Gillett*, 168 Cal.App.2d 102, 335 P.2d 736; *Barringer v. Arnold*, 358 Mich. 594, 101 N.W.2d 365; *State v. Raible* (Ohio App.) 117 N.E.2d 480; *Hinton v. Waste Techniques Corp.*, 243 Pa. Super. 189, 364 A.2d 724.

In a sense this case is a modern version of Barbara Tuchman's *Distant Mirror* because this case is almost a replay of a part of the legend of the West. Many people are too young to know anything about the Teapot Dome scandal, but it dealt with Wyoming oil reserves, and the most vital of all of the meetings of the alleged conspirators took place in Pueblo, Colorado. The Teapot Dome scandal resulted in the conviction of the only cabinet officer ever convicted pre–Watergate. Secretary of the Interior Fall was convicted of accepting a bribe from Sinclair, but Sinclair, tried to another jury, was acquitted on the charge of giving it.

Reports of the case are replete with names familiar to Colorado legend—Blackmer, Humphreys and Admiral (then Commander) Shafroth. Thus, I find it somewhat eerie that this 55–year old scandal provides a rule of law applicable to today's claim of right to refuse to disclose information. The case is reported as *Mammoth Oil Co. v. United States*, (1927) 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137, and the government was represented by Owen J. Roberts. Justice Butler delivered the unanimous opinion of the seven justices who participated in the case. This is what the Court said as to the failure of a party to call witnesses within that party's control:

"Familiar rules govern the consideration of the evidence. As said by Lord Mansfield in *Blatch v. Archer* (Cowper 63, 65): 'It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted.' The record shows that the Government, notwithstanding the diligence reasonably to be expected, was unable to obtain the testimony of Blackmer, O'Neil, Stewart, Everhart, or Osler in respect of the transaction by which the Liberty Bonds recently acquired by the Continental Company were given to and used for Fall. And the record contains nothing to indicate that the petitioners controlled any of them, or did anything to prevent the Government from obtaining their testimony, or that they or the evidence they might have given was within petitioners' power. But the failure of Sinclair to testify stands on a different basis. Having introduced evidence which, uncontradicted and unexplained was sufficient to sustain its charge, the United States was not required to call the principal representative of the company. His silence makes strongly against the company. It is as if he personally held the lease, were defendant, and failed to testify. The guiding considerations by which the proper significance of such silence is to be ascertained were well stated by Chief Justice Shaw in the celebrated case of *Commonwealth v. Webster*, 5 Cush. 295, 316: 'Where, for instance, probable proof is brought of a state of facts tending to criminate the accused, the absence of evidence tending to a contrary conclusion is to be considered,–though not alone entitled to much weight; because the burden of proof lies on the accuser to make out the whole case by substantive evidence. But when pretty stringent proof of circumstances is produced, tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed, and show, if such was the truth, that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer such proof, the natural conclusion is, that the proof, if produced, instead of rebutting, would tend to sustain the charge. But this is to be cautiously applied, and only in cases where it is manifest that proofs are in the power of the accused, not accessible to the prosecution.' While Sinclair's failure to testify cannot properly be held to supply any fact not reasonably supported by the substantive evidence in the case (*Northern Railway*

*Company v. Page*, 274 U.S. 65, 74), it justly may be inferred that he was not in position to combat or explain away any fact or circumstance so supported by evidence and material to the Government's case. *Runkle v. Burnham*, 153 U.S. 216, 225 [14 S.Ct. 837, 38 L.Ed. 694]; *Kirby v. Tallmadge*, 160 U.S. 379, 383 [16 S.Ct. 349, 40 L.Ed. 463]; *Bilokumsky v. Tod*, 263 U.S. 149, 154 [44 S.Ct. 54, 68 L.Ed. 221]; *Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 111 [47 S.Ct. 302, 71 L.Ed. 560]; *Clifton v. United States*, 4 How. 242, 247 [45 U.S. 242, 11 L.Ed. 957]; *Missouri, K. & T. Ry. Co. v. Elliott*, 102 F. 96, 102. As to facts appearing to have been within the knowledge or power of Sinclair, we find that the evidence establishes all that it fairly and reasonably tends to prove."

*Mammoth Oil* dealt with presumptions to be applied against private individuals who failed to come forward to testify, and it might be argued that such a presumption would not apply against public officials. However, the possibility of success of any such argument was destroyed in *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634. The Supreme Court unanimously held that where a convicted rapist claimed misconduct on the part of Georgia officials and where the Supreme Court had earlier remanded the case to permit the officials to deny the convicted defendant's testimony, failure to come forward to testify amounted to an admission of the defendant's charges. The Court said:

> "Thus in remanding the case for a hearing on voluntariness we indicated to the State that as the evidence then stood it had failed adequately to rebut petitioner's testimony that he had been subjected to physical violence prior to his confession. The State had every opportunity to offer the police officers, whose failure to testify had already been commented upon here, to contradict petitioner's version of the events. Its failure to do so when given a second chance lends support to the conclusion that their testimony would not, in fact, have rebutted petitioner's."

I have given the officials of the government of the United States of America exactly the same second chance the Supreme Court gave Georgia officials to deny the convicted defendant's charges, and now I am offering the Department of Justice a third chance. Thus far the response of the executive branch of our government has been to stonewall a claim of a right of secrecy. Even if the Government can exercise this curious claim, I think that law applicable to Georgia policemen applies with equal force to the Attorney General of the United States and to his subordinates.

■ I have received a letter from a Deputy Assistant Attorney General saying that these proceedings should not go forward in public because of an ongoing investigation, and I received a similar letter from the United States Attorney for the Southern District of New York. The United States Attorney for the District of Colorado joins in this position, and the Assistant Attorney General in charge of the Criminal Division has moved to quash a subpoena served on him. The Deputy Attorney General has instructed witnesses to refuse to answer questions designed to disclose material information, and each witness thus decides pretty much on his own what questions he will respond to and what questions he finds embarrassing. To say the least, the Justice Department seems to be determined that the facts surrounding this case shall not be made public. I gather that with reluctance justice would permit me to look into some of the information in secret, but I decline to accept that invitation for tacit approval of the government's refusal to permit the defendant to publicly present information which is clearly material to his sentencing and which perhaps should have been available for a jury's consideration. My thinking as to the Constitutional requirement for open trials is set forth in *United States v. Alberico*, 453 F.Supp. 178, and the latest ruling of the United States Supreme Court on that subject appears in *Richmond Newspapers, Inc. v. Commonwealth of Virginia*, ——— U.S. ———, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980):

"The First Amendment, in conjunction with the Fourteenth, prohibits governments from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.' These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government. Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted; as we have shown, recognition of this pervades the centuries-old history of open trials and the opinions of this Court. Supra, at 7–17, and n. 9.

"The Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open. Public access to trials was then regarded as an important aspect of the process itself; the conduct of trials 'before as many of the people as chuse to attend' was regarded. as one of 'the inestimable advantages of a free English constitution of government.' 1 Journals of the Continental Congress, supra, at 106, 107. In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees. '[T]he First Amendment goes beyond protection of the press and the self–expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.' *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783 [98 S.Ct. 1407, 55 L.Ed.2d 707] (1978). Free speech carries with it some freedom to listen. 'In a variety of contexts this Court has referred to a First Amendment right to "receive information and ideas." ' *Kleindienst v. Mandel,* 408 U.S. 753, 762 [92 S.Ct. 2576, 33 L.Ed.2d 683] (1972). What this means in the context of trials is that the First Amendment guarantees of speech and press, standing alone, prohibit government from

summarily closing courtroom doors which had long been open to the public at the time that amendment was adopted. 'For the First Amendment does not speak equivocally. . . . It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty–loving society, will allow.' *Bridges v. California,* 314 U.S. 252, 263 [62 S.Ct. 190, 86 L.Ed. 192] (1941)."

■ Surely the post–trial motions with which we are here troubled come under *Richmond Newspapers* rather than under the very limited pre–trial motions discussed in *Gannett Co., Inc. v. DePasquele* (1979) 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608, and I confess to puzzlement at the government's claim that Feeney's fate, or that anyone else's fate, should be decided in secret and, even worse, that his fate should be determined on the basis of the prosecution's claimed unilateral right to conceal vital facts. The public has an all encompassing interest in knowing the facts fed to a judge upon which he bases a sentencing decision.

As I have said, I don't know whether under applicable acts of Congress the executive branch does or does not have the right to decide what evidence it chooses to let a defendant present in a criminal case. I have asked for briefs on that subject because of the prominence and insistence of the lawyers asserting some right of the executive branch to put a person in jail based on a record limited by the ex parte decisions of the prosecution explained only by the phrase that disclosure of information which might acquit the defendant would "jeopardize an ongoing investigation." I freely admit that this approach to justice is closer to my concept of justice administered east of Berlin than it is to my concept of justice in the United States of America, and I am compelled to comment that I think that the basis for the position of the Department of Justice is a bureaucratic regulation rather than a statute enacted by Congress. [I recognize, of course, that there is a statute permitting the adoption of regulations, but everyone knows that Congress doesn't separately think about the myriad

of regulations adopted by the bureaucracies.]

Whether I shall or shall not recognize the claimed right to stubbornly refuse to testify because whenever a witness doesn't want to answer a question posed to him in a criminal trial in a United States District Court he glibly refuses to answer on the ground that the answer "would jeopardize an ongoing criminal investigation", is something I shall decide after full opportunity for briefing. Perhaps that is the law of the land. If it is, I shall follow it. If it isn't, I shall decide what action should be taken.

I firmly believe that the citizens of this country are sick and tired of being governed by regulations and decisions based on facts which government employees elect to conceal from taxpayer scrutiny. I think that the public concern is deep seated and that it is widely held. What a jury would do in considering defendant Feeney's guilt or innocence if it were to be made known to a jury that government officials refuse to testify to matters going directly to Mr. Feeney's criminal intent because the officials say the testimony which might acquit Mr. Feeney "would jeopardize an ongoing criminal investigation", I know not. However, I wonder if the defendant is not entitled to find out. Mr. Feeney charges that what he did was done at the government's request or at least with its knowledge and approval. He charges that influential persons are directly involved, and that he had no specific intent. Whether the assertions are true or false I know not, but I know from that which the government has been unable to block off that the claims are not frivolous, and that disclosure of all of the facts might influence a jury of Feeney's peers—at least as to some of the counts on which he was convicted. There are charges of failure to produce all of the tapes pursuant to subpoena and of alteration of tapes. Testimony has shown that either by intent or manufacturer's error only 30 minutes of a tape are in a 60 minute cassette. The testimony was that the chances of manufacturer's error

may be as slim as one in a million.[1] I don't know what a jury might think of those odds.

Exactly what the future of this case will be must await the filing of the briefs arguing the positions of the parties. If the law is that the executive branch of the government can frustrate a trial conducted in this country's courts I shall follow that law, but whatever the law may be, I plead with all concerned to permit and to make full disclosure of all of the facts. The defendant and the public are entitled to no less.

One John C. White has asked to intervene to seek a protective order. His request to intervene was granted instanter. He carelessly charges that grand jury material has been disclosed. Grand jury testimony Congress required to be disclosed under the provisions of 18 U.S.C. § 3500 was disclosed, but that is all. He carelessly charges that certain tape recordings were subject to Rule 6(e) of the Federal Rules of Criminal Procedure. I know of no tape recordings which have ever been presented to any grand jury. He implies that tape recordings were made available to the press by this court. He is welcome to carefully check out the chain of custody of every tape delivered to this court. I am confident that the pleading must have been filed without any investigation of the facts, but Mr. White should not forget that before the trial of this case, charges of leaks were leveled at an FBI agent, Roy Cohn, Kevin Krown and others. The tapes we have are copies, the chain of custody of which can be proven. Except for a short period of time, the originals have been in the custody of the United States Attorney's office for the Southern District of New York. The originals were kept in a locked filing cabinet, but copies maintained in that office were stashed in an unlocked filing cabinet. Perhaps counsel for Mr. White should think again about the implications contained in the request to intervene. After intervening, Mr. White's lawyer held a press conference and counsel said that Mr. White was

---

1. Feeney says he watched the cassettes as they recorded; that when they approached the end he would interrupt on a pretext and turn them over and that he knows no tape ran out.

working for the U.S. Attorney's office for the Southern District of New York. If so, I am not sure that anyone in the case was not an informer for some agency of the Department of Justice. With informers informing on informers; with one part of the Department of Justice refusing disclosure to the FBI as to matters important to their separate investigations of the same alleged criminal activity; with copies of the very sensitive tapes secured only in an unlocked filing cabinet, it is no wonder that intelligence concerning the investigations leaked as if strained through a sieve.

Mr. White has asked "full and equal access to all physical materials disclosed to the press on and after September 17, 1980, under the Court's orders of September 5 and 16, 1980." That request is unnecessary, but it is granted. The press has had access to the files of this case located in the Clerk's office, and that is all the press has had access to. Those files are public. Mr. White charges that "he has not been given an opportunity for access equal to that achieved by the press. As a consequence, he cannot protect his interest in any forum, nor can he respond to any inquiries on a footing equal to that achieved by the press. The press has no greater right to grand jury materials than the public at large...."

■ I agree with the statement as to the right of the public to materials supplied the press and as to the right of the press to grand jury materials, but there has been no disclosure of any grand jury information except the § 3500 material, and that's equally available to intervenor. The remainder of his charges I believe to be incorrect. White has always had "opportunity for access equal to that achieved by the press." He can "protect his interest in (this) forum", and all he has to do is to request an opportunity to testify. White says he "should be given the same measure of protection as government informants, [his lawyer is quoted in the press as suggesting that Mr. White was an informant] particularly where unfounded charges are made at a time and place preventing him

from presenting proof of their falsity." If there is any informer in this case whose identity hasn't been disclosed by his own lawyer or by the government, I can't imagine who it could be, and there is nothing to prevent Mr. White from presenting proof of the falsity of any charges. Truth or falsity of those very charges bear heavily on the sentence to be imposed on Mr. Feeney and on his chances for a new trial. I invite Mr. White's testimony.

I repeat that which I have said before. I recognize the positions held by the persons interested in this case, and I shall vacate anything I have set to accommodate the schedules of any public official or of Mr. White should any of them wish to testify in this case. I will hear that testimony weekdays or weekends, before or after the briefs are filed, depending on the desires of the persons who wish to testify.

■ I come now to the most disturbing aspect of this entire sordid mess. Counsel for defendant Feeney has represented to the Court that there are threats, express or implied, that if Feeney testifies he will face a 77–count indictment involving essentially the same matters on which he has been tried in Colorado. Counsel has stated that testimony which would be required to support Feeney's accusations would necessarily incriminate him if tried on the threatened new indictment or if a new trial were granted in this case. The government has already been able to convict Feeney in this case without sworn admissions on his part, and it seems reasonable to assume that the suggested 77–count indictment will not stand or fall on his testimony. Feeney does not seek immunity from prosecution on the 77–count indictment nor immunity from prosecution in the retrial of this case or any other case. However, he doesn't want to incriminate himself, and he asks the grant of use immunity and only use immunity. It is to be remembered that the grant of use immunity is no license to commit perjury. If Feeney is granted the use immunity and if he lies under oath he can be and he should be prosecuted for perjury. I would grant him the use immunity in a minute if I

thought that I could, because I think that the public interest demands airing of the important charges and countercharges. However, I think that the authority to grant immunity is a right Congress has given to the executive branch of the government and, more specifically to the Department of Justice. Coincidentally, in an entirely unrelated matter, I had occasion to discuss the question at some length, and the reasons for my belief that the Department of Justice [which currently acts through Mr. Heyman is authorizing immunity] has the sole right to authorize immunization of a witness is set forth in *United States v. McMichael* (1980) 492 F.Supp. 205.

In this case, the Department of Justice has already granted use immunity to other defendants and others who were not indicted, but, at least thus far, it has stubbornly refused to free up the testimony of Mr. Feeney. If ever there could be a situation in which the witness is "available" to the prosecution and "unavailable" to the defendant this is that situation, albeit the witness is the defendant himself. The Department of Justice wields the club to block off testimony of a convicted defendant in a sentencing proceeding. The club is threat of use of the testimony in another prosecution for the same or related acts which must be disclosed plus a similar threat of use of the testimony in this case should it have to be retried. Either Mr. Feeney can or he cannot support his charges. They are serious and they should be inquired into, but not at the expense of surrender of his constitutional rights. The time has come to see who is bluffing. If Mr. Feeney's accusations are groundless he is opening the door to a perjury prosecution. If they are well founded, he should be permitted to testify with the protection of the very limited grant of use immunity. If the Department of Justice will take the statutory steps it and it alone can take under the provisions of 18 U.S.C. § 6003, a court acts in a ministerial capacity in signing the grant. The Department of Justice can prevent Feeney's testimony, but if it does, the presumptions applied in *United States v. Mammoth Oil* and in *Sims v. Georgia* will have to be applied by me as a matter of law. The public will apply them as a matter of common sense.

In conclusion, I capsulize the efforts of the Department of Justice to block off disclosure of facts I think are important to this case and to the administration of justice:

1. From the commencement of this case, the United States Attorney's Office for the District of Colorado has tried to prevent examination of the tapes by defendant or his lawyer.

2. From the commencement of this case the United States Attorney's Office for the Southern District of New York has tried to prevent examination of the tapes by defendant or his lawyer.

3. At the insistence of the government, pretrial hearings were held *in camera.*

4. When I suggested that although I believed myself to be bound by the ruling of a colleague as to the use of the tapes in evidence, I thought that *Brady v. Maryland* required that the tapes be made available to defendant and his lawyer in connection with sentencing;

 (a) The United States Attorney's Office for the District of Colorado in open court opposed the disclosure.

 (b) The United States Attorney for the Southern District of New York wrote me a letter asking that there be no such disclosure.

 (c) A deputy Assistant Attorney General wrote me a letter asking the same thing.

5. After the tapes were disclosed to defendant and his counsel [but not to the public] an evidentiary hearing was set. Then:

 (a) The Assistant Attorney General in charge of the criminal division asked that a subpoena which would require his appearance for cross–examination be quashed.

 (b) The Deputy Attorney General instructed government witnesses to

refuse to testify whenever in their individual judgment an answer would "jeopardize an ongoing criminal investigation," and, once, when the question would "disclose the internal procedures of the office of the United States Attorney for the Southern District of New York."

6. All government witnesses with knowledge of defendant's activities agree that his services to the government were "invaluable," but, when defendant wants to testify as to the nature of those services, he is told that anything he says will be subject to use to convict him in a threatened 77–count indictment.

As I have said, I have never had occasion to study the law in this area and I have asked for briefs. Perhaps the Department of Justice has the awesome power to decide what information the public is entitled to hear. If that is the law, it shouldn't be, but some of the most highly respected lawyers in the United States adamantly take this position, and my respect for them is such that I defer to their demands pending study of the briefs to be filed.

In the public interest, I have urged that use immunity be provided defendant Feeney, but urge is all I can do. If the Department of Justice doesn't want him to testify, use immunity can be refused and he would testify only on surrender of his Fifth Amendment rights. That is the reward paid a person who risked his life and expended thousands of dollars of his own money in providing that which representatives of the United States Attorney's Office for the Southern District of New York testified was invaluable.

## APPENDIX

## MEMORANDUM OPINION AND ORDER

WINNER, Chief Judge.

Defendant James Feeney has filed a motion captioned "Motion for Extension of Time and for Production of Documents and Records." This motion was filed following his conviction of more than 20 felony counts, and the motion says that defendant and his attorney must listen to some 60 hours of tape recordings of telephone conversations defendant participated in at the request of or at least with the knowledge of the United States Attorney's Office for the Southern District of New York. Additionally, defendant asks to review notes of conversations he had with an investigator for that United States Attorney's Office, which notes were made by the investigator and which supposedly reflect what was said in the course of those conversations many of which supposedly report Feeney's activities engaged in to assist that U.S. Attorney's investigations. Defendant says that he should have been furnished this material before trial and in addition, that he has a separate and distinct right to have the information made available post trial. Another judge ruled on the requested pretrial disclosure and his ruling will not be disturbed by me. The alleged separate and distinct ground for post trial disclosure is something I must pass on and I do.

Both sides are in agreement that defendant Feeney was acting in an undercover capacity in connection with investigations being conducted by the United States Attorney's Office for the Southern District of New York, and both sides suggest that the investigations are important and sensitive.

At a hearing on August 29, 1980, the Colorado United States Attorney's Office opposed the motion, and I was told about the problems allegedly caused the United States Attorney's Office for the Southern District of New York should the motion be granted. It was represented to me that the New York United States Attorney wanted to participate in a hearing on the motion, but that in that large office, there is only one assistant who can present the argument and that he was on vacation. Although I expressed curiosity as to the standing of the Southern District's United States Attorney to argue against a motion filed in a Colorado case, I agreed to hear the matter after New York counsel wound up his vacation. I set the matter for hearing on September 5, 1980, with the assurance that if this date

was not convenient to the Southern District's United States Attorney, I would hear argument at any hour of any day, including Saturdays, Sundays and Labor Day, between August 29, 1980 and September 7, 1980. [Starting September 8, 1980, I will be in trial in Grand Junction, Colorado.] I was advised yesterday that the United States Attorney's Office for the Southern District of New York elected not to appear and that in accordance with an option I had extended, the argument would be presented in writing. The letter failed to arrive before the scheduled hearing, but I borrowed and read the Colorado U.S. Attorney's telefax copy. [Prosecutors are provided with the luxury of wire communication; judges are not.]

Also, the Department of Justice itself, acting through Mr. Feeney, wrote that disclosure to Feeney of the content of his own conversations will "interfere with an ongoing criminal inquiry." This is my first experience with entry into a Colorado fray by the Department of Justice urging the position of a United States Attorney from some other district.

The government says that disclosure of the material might interfere with an ongoing grand jury investigation which has already lasted a year and a half. For purposes of this order, I accept this representation—especially with the concern voiced by a Deputy Assistant Attorney General. However, I think that the prosecution is the one faced with the necessity for making a discretionary decision because to me the law gives a judge no choice. A defendant has certain absolute rights under our system of justice, and he cannot be deprived of those rights because of claims by the prosecution that if he is given those rights, some allegedly more important case may be jeopardized. If this were the law, there would be no limit on agency coverups. The prosecution here can, and it must, decide which case is the most important, and if it elects to go forward with this case, the defendant is entitled to his rights without reference to difficulties the exercise of those rights may present in other cases. The prosecution can, if it wants to, delay the presentation of a case until the investigation of some related case is completed [and here there seems to be no statute of limitations about to run] or the prosecution can decide which case it wants to push, letting the chips fall where they may in the companion case. These are problems faced by prosecutors throughout the United States since time immemorial, and, although the Colorado prosecution which has been brought and the New York grand jury investigation which is supposed to be going on are handled by separate United States Attorneys, the whole system is under the supervision of the Department of Justice, and I am confident that a directive issued by the Attorney General will be honored by any United States Attorney who receives it.

Defendant's present motion is two-pronged. He says that Rule 16 of the Federal Rules of Criminal Procedure requires that he and his attorney be permitted to listen to his own conversations taped by him with the knowledge and approval of the United States Attorney's office for the Southern District of New York, and he says that there is a constitutional and statutory right to listen to those tapes and to inspect notes of his own conversations.

Rule 16(a)(1)(A) says:

"[u]pon request of a defendant the government shall permit the defendant to inspect and copy or photograph; any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the exercise of which is known, or by the exercise of due diligence may become known to the attorney for the government...."

Rule 16 was expanded in 1966 to permit much greater discovery, probably because of the Supreme Court's decision in *Cicenia v. LaGay*, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 and the Advisory Committee Note to Rule 16(a) emphasizes, "The amendment also makes it clear that discovery extends to recorded as well as written statements." I think that there is no doubt that these tapes are within the intent

of Rule 16(a), but I recognize that unless they are relevant they need not be disclosed. I have not listened to the 60 hours of tapes, and I am bound by the pretrial ruling of a fellow judge that they are not relevant to the question of defendant's guilt or innocence. Moreover, I am bound by a similar ruling on a motion under Rule 16(c) as to inspection of the investigator's notes of his conversations with Mr. Feeney insofar as the question of guilt or innocence is concerned.

Rule 16, of course, ties squarely to *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 but Rule 16 has to do with trials while *Brady v. Maryland* is two-pronged. Its declaration of a constitutional right to disclosure of exculpatory material says that there is mandatory disclosure of anything which bears on guilt *or on punishment*, and prosecutors all too frequently forget about the second requirement for disclosure.

This is not my first discussion of prosecutorial duty under *Brady v. Maryland*, and I do not purpose to talk about that duty as fully as I did in *United States v. Countryside Farms* (1977) D.C.Utah, 428 F.Supp. 1150. However I have not retreated from the thinking there expressed, and I still say that doubts must be resolved in favor of the defendant. *Brady v. Maryland* says that all material "favorable to an accused . . . where the evidence is material either to guilt *or to punishment, irrespective of the good faith or bad faith of the prosecution,*" must be supplied to defendant and his counsel. Thus, worthy prosecutorial motive in secreting tapes and notes doesn't have anything to do with a defendant's rights to disclosure of something which may lessen his sentence.

It is deserving of comment that *Brady v. Maryland*, dealt only with punishment, just as does this ruling, and direct quotation from Justice Brennan's opinion is helpful:
"... the suppression by the prosecution of evidence favorable to an accused upon request *violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.*

"The principle of *Mooney v. Holohan* [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused which, if made available, *would tend to exculpate him or reduce the penalty* helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not the result of 'guile.' "

The quotation is especially apt here because the prosecution orchestrated this trial to offer for the jury's consideration carefully selected taped conversations which contributed much to defendant's conviction, yet now the government doesn't want the rest of the tapes made available even though they may greatly influence the decision to be made as to the punishment to be imposed. This is somewhat inconsistent with the duty of fairness our system of justice imposes on the prosecution. It is no answer to say that the government doesn't want the defendant and his lawyer to review defendant's own taped conversations when the government does not object if I listen to them *in camera*. From the government-selected tapes played to the jury it is manifest that the parties to the conversations used innuendo and code understandable to defendant but not always understandable to a stranger to the setup. I need to have defendant and his lawyer decipher the converstions, and, without their help, the important meaning of conversations might escape me and the protections of *Brady* would be thus denied defendant.

*Brady v. Maryland* reversed on Fifth Amendment grounds, and as I tried to explain in *Countryside Farms*, Fifth Amendment claims can and they frequently should be reached post trial. Moreover, I know of no prohibition against reviewing Sixth Amendment claims of effective assistance of counsel after all of the facts are known. I know not how defense strategy might have differed had Mr. Sears heard the tapes pretrial, but he can explain this to me on a new trial motion if he hears them now. I deem it essential to the imposition of punishment and I deem it essential to a review of Fifth and Sixth Amendment claims made in post trial motions that before I impose sentence I be fully informed as to the nature and extent of defendant's cooperation with law enforcement agencies and I deem it equally essential that counsel have an opportunity to argue the meaning and importance of his client's monitored conversations when the conversations were taped by and at the urging of government agents with the consent of defendant. I do not think that *Brady v. Maryland* permits the withholding of this information from defendant and his counsel when the facts may be so very important in deciding the penalty to be imposed.

As I suggested at the outset, I must assume that the government made a reasoned decision to name defendant Feeney in this indictment and to present the case to the Colorado grand jury with full awareness that there was another grand jury investigation going on in the Southern District of New York. The government could have waited to present this case to the Colorado grand jury or it could have skipped naming Feeney because he is the only defendant claiming standing to review the tapes and notes. The government decided to go forward, and with that decision made, the defendant's rights under Rule 16 and under the Constitution of the United States come into play. He is not going to be deprived of those rights because the government doesn't want them to be afforded him or because the government made a mistake in prosecuting him at this time. I have been told that to disclose the information to defendant which I think he has an absolute right to have disclosed will put in jeopardy the other investigation. Whether it will or will not do so I have no way of knowing, but, even if it will, this is not a basis for refusing defendant that which he has a right to receive. The court has a duty to follow the law. The government has a discretion as to whether it does or does not want to pursue this case against defendant Feeney. Thus far it has exercised its discretion to order "Damn the torpedoes! Captain Drayton, go ahead! Jouett, full speed!" With the Department of Justice so ordering, a court can only be sure a defendant's rights are protected.

The final decision is for the Department of Justice to make, because I order that all of the tapes of Feeney's conversations the government has in its possession and all notes of conversations of Feeney in the government's possession be made available to Feeney and his counsel for inspection and playing. However, this order shall not become effective for 10 days from its date to permit the prosecution to once more decide on its priorities. If the ongoing grand jury investigation be deemed so important that risk to accomplishment of its purpose which may result from letting defendant listen to conversations he participated in is a risk the prosecution doesn't want to accept, the government can dismiss against this one defendant and this order will thereupon become void. It is for the Department of Justice to decide if it wants judgments to enter on the jury verdicts convicting Mr. Feeney with whatever slight danger there may be to the New York grand jury's work or whether it thinks that such danger is so grave that the risk should not be taken. The government has a choice. I don't. I fail to understand how a whole lot of harm can come from letting Feeney and his lawyer listen to the taped conversations Feeney had with others at the government's request, but I don't know anything about, and I don't want to know anything about, what is going on in the secret grand jury proceedings in New York. Apparently the government thinks that the matter is very

 sensitive. If it is sensitive enough, I have given the government an escape hatch, and I allow the Department of Justice 10 days to think about this dilemma.

The government falls back on a secondary position and asks that if I order disclosure, I then order that disclosure be made only to defendant's lawyer. The request is:

"... that such access be granted on the condition that the materials be reviewed solely by Mr. Feeney's counsel and be retained exclusively in his possession, that they or their contents not be revealed to any third party, that they be revealed to Mr. Feeney only if counsel, as an officer of the Court, determines that such disclosure to Mr. Feeney is necessary to the proper representation of Mr. Feeney and that any copies be returned to the Court after they have been used by Mr. Feeney's counsel."

There are many reasons I can't go along with this request. I am asked to impose a secrecy obligation which is something I believe that I am without power to do. This defendant has been prosecuted in a United States District Court, and criminal trials in our judicial system are public events. *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. With the long standing tradition of secrecy of grand jury proceedings, it is contempt of court for a prosecutor to try to gag a grand jury witness by imposition of an oath of secrecy. See, Rule 6(c) F.R.Cr.P. With the long standing tradition of public trials, it is beyond my ken how I can effectively do that which a grand jury can't do.

The requested order would place defense counsel in an untenable position. He needs, just as I need, the help of defendant to interpret the tapes, and I am unwilling to restrict in any way the freedom of communication between attorney and client. The Canons of Professional Responsibility impose on all lawyers the requirement that there be no ex parte communications with the court. [Copies of the letters to me from the United States Attorney for the Southern District of New York and from the Deputy Assistant Attorney General Criminal Division do not appear to have been sent to defense counsel, but I am supplying him with copies, and the letters are part of the public file. I differ sharply with the comment that I asked for the position statement. My letter to the Colorado Assistant United States Attorney explains the circumstances, and it too is in the file.] If I were to enter the order which has been requested, defense counsel would face a contempt of court charge were he to testify before another court, grand jury or investigative body as to the things he heard on the tapes, and I possess no power to restrict lawful inquiry by another court, a grand jury or a Congressional Committee.

*Brady v. Maryland* grants a total, and not a limited right to a defendant to present matters which may lessen punishment, and the right of allocution demanded by Rule 11 is a right of the defendant—not just his lawyer. He can't be blocked off from refreshing his recollection as to his own conversations when he may want to discuss them in open court in advance of his sentencing. Moreover, defendant may be required to testify in some future proceeding as to these very conversations, and it would be less than fair to say that he must testify from memory without opportunity to refresh his recollection in advance of cross-examination as to 60 hours of his own conversations.

To sentence a defendant on more than 20 convictions without giving him opportunity to review these tapes would be to ignore the legend on the wall of the Department of Justice quoted by Justice Brennan in *Brady v. Maryland*, and to follow the recommendation of the Department of Justice makes even less sense to me. That recommendation is:

"The Criminal Division recommends that the motion for access by Feeney be denied and that the materials in question be placed under seal and held for such review of Judge Finesilver's order as the Court of Appeals deems appropriate."

What the Department of Justice is recommending, then, is that I impose a sentence which I think is illegal just so the

Court of Appeals can review an earlier order of a fellow judge. I don't know how I could prevent the Court of Appeals from reviewing my illegal sentence. Of course, that would cause a lot of delay, and other trials or proceedings might be frustrated, but that's all I can think would be accomplished, because the violation of *Brady v. Maryland's* command to make available material exculpatory as to punishment would still be there.

The disclosure must be made and no order of secrecy will be issued. What is and what is not disclosed by defendant Feeney and his lawyer, and to whom, are for them to decide. This order I believe to be required under the law, and I think that I have no discretion. The Department of Justice does have discretion. It can, if it wishes, dismiss the indictment against defendant Feeney and that will nullify this order. I have given the Department 10 days to decide its priorities, or, of course, this stay gives opportunity for application for a writ of prohibition.

The logistics and procedures for making the tapes available to defendant and his lawyer and for preserving their integrity will be worked out during the 10–day stay period.